# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-40415

United States Court of Appeals
Fifth Circuit

**FILED**

April 3, 2019

Lyle W. Cayce
Clerk

JERI LYNN RICH,
as representative for Gavrila Covaci Dupuis-Mays, an incapacitated person,

　　　　Plaintiff–Appellee,

versus

MICHAEL PALKO; KEITH DUANE HUDGENS,

　　　　Defendants–Appellants.

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, SMITH, and WILLETT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Jeri Rich sued Michael Palko and Keith Hudgens of the McKinney Police Department ("MPD") on behalf of her adopted son, Gavrila Dupuis-Mays, who has been declared an incapacitated person by the State of Texas. Rich sought damages under 42 U.S.C. § 1983, alleging that the officers had violated Dupuis-Mays's Fourth and Fourteenth Amendment rights. The district court

No. 18-40415

denied the officers' motion for summary judgment based on qualified immunity ("QI"). We reverse and render a judgment of dismissal with prejudice.

I.

Dupuis-Mays sustained a brain injury as an infant and has cerebral palsy, mental retardation, bi-polar disorder, depression, ADHD, and epilepsy. On July 2, 2015, he was admitted for inpatient psychiatric evaluation for depressed ideation. He was released on July 10, 2015, and returned to a group home in McKinney, Texas, where he had been living.

Between July 10 and 11, MPD was called to the group home four times because Dupuis-Mays kept trying to run away. The final of those visits stemmed from a 911 call made by Dupuis-Mays's caseworker, Rhonda Holley, on Saturday July 11 at 2:01 a.m.[1] Holley asked police to transport Dupuis-Mays to Green Oaks Hospital, explaining that Dupuis-Mays needed inpatient care because he was "in a psychotic phase, where he is verbally and physically aggressive towards staff." Holley confirmed that Dupuis-Mays had not hit anyone that night but was "covered in feces and refusing to bathe." Holley told the 911 operator that she had initially called Green Oaks, and they recommended that she call 911.

Palko and Hudgens responded. When they arrived at the group home, they briefly conversed with one of Dupuis-Mays's caretakers, who reported that Dupuis-Mays was becoming increasingly psychotic and that Green Oaks directed the group home staff to bring him in for care. She further explained that neither she nor other staff members felt safe transporting Dupuis-Mays to Green Oaks: He was "threatening" Holley, and "he just threatened our

---

[1] Most of the facts come from an audio recording of the 911 call made by Holley; a video showing a waiting room at Green Oaks; videos showing the Green Oaks triage room from two angles; and Hudgens's audio feed while at the group home and Green Oaks.

children," who were present that night.

The officers approached Dupuis-Mays, who was covered in feces, and dialogued with him at length. At the officers' urging, Dupuis-Mays eventually agreed to shower and change clothes. Holley told the officers what had precipitated her 911 call. Dupuis-Mays had defecated on himself and had removed his clothes and put them on the porch. He had scattered tables in the home's backyard and refused to follow staff instructions. Staff members also reported that Dupuis-Mays's aggression had been increasing and that his psychiatrist told the staff that their only option until Monday was to transport Dupuis-Mays back to Green Oaks for an assessment. Dupuis-Mays's doctors had called Dupuis-Mays "unstable."

Once Dupuis-Mays had showered and dressed, he voluntarily approached the officers and smoked a cigarette while talking with them. After about ten minutes, the officers told Dupuis-Mays that he would be going for a ride in the police car; they handcuffed and led him to the police car. The three talked casually during the ride to Green Oaks and arrived without incident.

The officers led Dupuis-Mays, still handcuffed, into the Green Oaks waiting room and seated him in a chair near the door to the triage room. Dupuis-Mays eventually stood up from the chair and began talking to the officers, saying, among other things, "I'll be glad you go to hell [*sic*]," and "I hate police officers." At least two other patients were in the waiting room. After Dupuis-Mays refused to sit down, the officers retuned him to his chair. A few seconds later, Dupuis-Mays spat toward Palko's face. The officers turned away from the spitting before approaching Dupuis-Mays, moving his head between his legs, and holding him in that position for about five minutes. The video and audio indicate that Dupuis-Mays continued spitting at and berating the officers, even with his head between his legs.

Dupuis-Mays was called back to the triage room, where quarters were tight:  He was seated in a chair in one corner of the room with a small file cabinet directly to his right and the triage nurse's desk to the right of the cabinet.  A second file cabinet was in the corner opposite Dupuis-Mays, about three to four feet in front of him.  The officers stood by a door catty-corner from Dupuis-Mays.  Because of the file cabinets' positioning, the corridor from the officers to Dupuis-Mays was narrow.

After a couple of minutes, Dupuis-Mays grew agitated and began saying, "I hate police officers!  I hate 'em!"  The triage nurse urged him to "stay calm," but Dupuis-Mays retorted, "Hell no!"  The officers tried to pacify him, encouraging him that they were being nice.  Dupuis-Mays continued, however, in escalating volume, "I hate police officers!  F*** them police officers!  I hope cops die!"  "Do you really mean what you say?" Palko queried, to which Dupuis-Mays responded, "I hope you die!"  "That's really mean of you to say," Palko answered calmly.

The nurse left the room, leaving the officers with Dupuis-Mays.  About twenty seconds later, Dupuis-Mays spat toward Detective Palko, who stepped back, and told him, "Don't spit on me, Bud."  Dupuis-Mays then leaned forward, stared at Palko, and spat directly at his face.

Palko stepped across the room toward Dupuis-Mays through the opening left by the two file cabinets.  Palko placed both of his hands on Dupuis-Mays's head and began moving him down and diagonally from his chair to the middle of the room.  Palko stood with his body in front of the corner filing cabinet, his left foot in front of and parallel with the cabinet's side.  Palko's eyes were consistently directed downward—not toward the file cabinet.  Hudgens also approached and placed his right hand on Dupuis-Mays's shoulder blade and his left hand on Dupuis-Mays's handcuffed hands.  Midway to the ground, Dupuis-

Mays's torso began to turn toward the corner cabinet, his foot apparently caught behind the file cabinet directly to the right of his chair. Palko was still in front of the corner cabinet. As Dupuis-Mays twisted, Palko's left elbow bumped the corner cabinet, his hand fell off Dupuis-May's head, and Dupuis-Mays's head fell into the corner cabinet. Notably, Palko did not have a hand on Dupuis-Mays's head as Dupuis-Mays fell into the cabinet.

The officers promptly helped Dupuis-Mays up and carefully moved him to a seated position on the floor. They did not apply additional force. Dupuis-Mays's head was bleeding significantly, and he sustained a five-inch gash.

Hudgens filed a post-incident report with MPD. That report did not comport with the video from the triage room, so MPD began an internal affairs investigation, during which MPD Sergeant Agan spoke to Palko, who accurately recalled and recounted the events. Hudgens later watched the video, listened to the audio, and corrected his report.

Rich sued Palko and Hudgens under § 1983, claiming that they had violated Dupuis-Mays's Fourth, Eighth, and Fourteenth Amendment rights.[2] The officers moved to dismiss for failure to state a claim, and the district court granted the motion respecting Rich's Eighth Amendment claim. But the court deferred the remaining claims for disposition after discovery on whether the officers were entitled to QI. Following discovery, the officers moved for summary judgment on grounds of QI. The district court, adopting the report and recommendation of the magistrate judge, denied QI, and the officers appealed.

---

[2] Rich also sued the City of McKinney, alleging that it "employs a policy, practice, or custom that permits police officers to use excessive force and file false police reports." The city is not a party to this appeal.

No. 18-40415

II.

We have jurisdiction to consider this interlocutory appeal because the "general rule" that "[a]n order denying a motion for summary judgment is generally not a final decision within the meaning of § 1291 and is thus generally not immediately appealable . . . does not apply when the summary judgment motion is based on a claim of [QI]." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014) (citations omitted). But "we have jurisdiction only to decide whether the district court erred in concluding as a matter of law that officials are not entitled to [QI] on a given set of facts." *Cantrell v. City of Murphy*, 666 F.3d 911, 921 (5th Cir. 2012) (internal quotation marks and citation omitted).

We review *de novo* the legal issue whether the district court erred in denying a motion for summary judgment based on QI. *Escobar v. Montee*, 895 F.3d 387, 393 (5th Cir. 2018). Although we "review the *materiality* of any factual disputes," we do not review "their *genuineness*." *Curran v. Aleshire*, 800 F.3d 656, 660 (5th Cir. 2015) (quoting *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)). If there are factual disputes, "we view the facts in the light most favorable to the nonmoving party." *Plumhoff*, 572 U.S. at 768.[3]

III.

A plaintiff makes out a § 1983 claim if he "show[s] a violation of the Constitution or of federal law, and then show[s] that the violation was committed by someone acting under color of state law." *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008) (internal quotation marks and citation omitted). But government officials performing discretionary duties can assert QI. *See, e.g.*, *Haverda v. Hays Cty.*, 723 F.3d 586, 598 (5th Cir. 2013). Once an officer

---

[3] We will not, however, accept a plaintiff's version of the facts "for purposes of [QI] when it is 'blatantly contradicted' and 'utterly discredited' by video recordings.'" *Curran*, 800 F.3d at 664 (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

invokes the defense, the plaintiff must rebut it by establishing (1) that the officer violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was "clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

To identify whether the law was clearly established when the officers acted, "we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (internal quotation marks and citations omitted). Though "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).[4] "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). In sum, QI "represents the norm, and courts should deny a defendant immunity only in rare circumstances." *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (internal quotation marks and citations omitted). "It is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam) (internal quotation marks and citation omitted).

Rich alleges that the officers violated Dupuis-Mays's Fourth Amendment rights through unlawful detention, excessive force, and false reporting. The

---

[4] *See also Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 578–79 (5th Cir. 2009) (quoting *Pierce v. Smith,* 117 F.3d 866, 882 (5th Cir. 1997)) ("[P]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.").

No. 18-40415

officers assert QI on each claim.

A.

The officers insist that they are entitled to QI on Rich's claim that the officers violated Dupuis-Mays's constitutional rights by unlawfully detaining and transporting him to Green Oaks. "The probable cause standard applies in the context of a seizure of the mentally ill." *Cantrell*, 666 F.3d at 923 n.8. An officer has probable cause to detain if the two requirements for emergency detention under Texas law are satisfied: "(1) [T]he officer has reason to believe and does believe that a person is mentally ill and because of that illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody." *Id.* at 923 (citing TEX. HEALTH & SAFETY CODE ANN. § 573.001).

The parties do not dispute that Dupuis-Mays is "mentally ill" under Texas law.[5] They focus, instead, on whether he posed a substantial risk of serious harm to himself or others. That sort of substantial risk "may be demonstrated by[ ] (1) the person's behavior; or (2) evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty." TEX. HEALTH & SAFETY CODE ANN. § 573.001(b). An officer may base his belief that the person meets the statutory criteria for apprehension either on "a representation of a credible person[,] or . . . on the basis of the conduct of the apprehended person or the circumstances under which the apprehended person is found." *Id.* § 573.001(c)(1)–(2). An

---

[5] A person is mentally ill under Texas law if he has "an illness, disease, or condition, other than epilepsy, dementia, substance abuse, or intellectual disability, that[ ] (A) substantially impairs [his] thought, perception of reality, emotional process, or judgment; or (B) grossly impairs behavior as demonstrated by recent disturbed behavior." TEX. HEALTH & SAFETY CODE ANN. § 571.003(14).

officer who detains a person under those provisions "shall immediately" take him to "the nearest appropriate inpatient mental health facility" or an otherwise designated mental health or emergency facility. *Id.* § 573.001(d)(1)(A)–(B).

The video and audio evidence supports that the officers relied on the representations of credible persons to believe that Dupuis-Mays met the statutory criteria for apprehension. According to the group home staff, Dupuis-Mays's behavior posed a substantial risk of harm to others. His caretakers stated that he was in a "psychotic episode," "verbally and physically aggressive towards staff." He had threatened staff members and children, disturbed property in the backyard, soiled and refused to clean himself, and ignored the instructions of the staff, who were so frightened that they refused to transport him. Further, a treating psychiatrist—as well as staff at the Green Oaks hospital—had recommended that Dupuis-Mays be taken to the hospital for psychiatric evaluation.

Dupuis-Mays's conduct and the circumstances in which the officers found him also allowed them reasonably to conclude that Dupuis-Mays was experiencing "severe emotional distress and deterioration in [his] mental condition to the extent that [he could not] remain at liberty." *Id.* § 573.001(b)(2). The officers found him covered in feces, refusing to bathe, and ignoring instructions. Dupuis-Mays, moreover, responded to Palko's exhortation to clean himself, because the feces covering him could make him "feel bad," by saying that he wanted to feel bad.[6] Additionally, Dupuis-Mays had attempted to run away from the group home several times that evening.

---

[6] Palko asked Dupuis-Mays, "You don't want to feel bad, right?" "I do," Dupuis-Mays replied. Palko rejoined, "Why is that?" And Dupuis-Mays responded, "I just do."

No. 18-40415

Rich suggests that the officers did not have sufficient evidence to detain Dupuis-Mays lawfully because this court's cases concerning lawful detention of a mentally ill person under Texas law all involve a suicide threat.[7] That is so, but nothing in those cases suggests that a suicide risk is a prerequisite for detention under Texas law. Indeed, holding so would nullify the statute's allowance for detention if the mentally ill person poses a substantial risk of harm to others.[8]

Based on the representations of credible persons and their own observations, the officers reasonably concluded that Dupuis-Mays was mentally ill and posed a substantial risk of serious harm to himself or others.[9] They accordingly had a lawful basis to detain him under the Texas Health and Safety Code and complied with the Code's requirements by taking him directly to Green Oaks.

---

[7] *See Cantrell*, 666 F.3d at 923 (concluding that officers had probable cause to detain woman making suicidal statements); *Sullivan v. Cty. of Hunt*, 106 F. App'x 215, 218 (5th Cir. 2004) (probable cause to detain where psychiatrist indicated that the person "was a suicide risk"); *Martinez v. Smith¸* 1999 WL 1095667, at *1–2 (5th Cir. Nov. 4, 1999) (unpublished) (probable cause to detain where individual had told an acquaintance that she was suicidal and avoided contact with officers by shutting the door on and running from them).

[8] Texas caselaw confirms that a mentally ill person may be lawfully detained without a warrant even where he is not threatening suicide. *See, e.g.*, *In re M.R.*, No. 02-15-00221-CV, 2015 LEXIS 11297, at *2 (Tex. App.—Fort Worth Nov. 3, 2015, no pet.) (mem. op.) (discussing the lawful detention and transport, pursuant to Texas law, of a mentally ill patient who "evidenced a substantial risk of serious harm to himself or others" in that he was disoriented, hallucinating, grunting, not bathing, soiling himself, and not taking his medication); *In re J.M.*, No. 02-14-00398-CV, 2015 LEXIS 1420, at *2 (Tex. App.—Fort Worth Feb. 12, 2015, no pet.) (mem. op.) (describing the lawful detention under Texas law of a mentally ill person who was physically aggressive toward her parents, behaving recklessly, and experiencing psychosis and paranoia).

[9] The magistrate judge's report and recommendation, fully adopted by the district court, found the officers' detention of Dupuis-Mays unlawful in part based on MPD's internal investigation of the events, in which Agan suggested that the officers had no lawful basis to detain Dupuis-Mays. Whatever Agan concluded, "probable cause exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm." *Cantrell*, 666 F.3d at 923. The video and audio indicate that there was enough evidence to believe the statutory criteria for detention had been satisfied.

No. 18-40415

The officers did not violate Dupuis-Mays's constitutional rights and are entitled to QI on the unlawful-detention claim.

Even assuming the officers violated Dupuis-Mays's constitutional rights, Rich has failed to demonstrate that clearly established law put the officers on notice that their conduct was illegal. In fact, established law in this circuit suggests that the officers were acting legally by relying on the representations of credible persons that Dupuis-Mays met the statutory requirements for apprehension.[10] Rich points to no case even suggesting that staff at a group home for disabled persons, who have been told by a hospital and a psychiatrist that a patient should be taken to the hospital, are not credible persons under the Texas Health and Safety Code. The district court erred in denying QI on the claim of unlawful detention.

### B.

The officers also assert QI on Rich's claim that the officers violated Dupuis-Mays's Fourth Amendment rights by using excessive force to restrain him in the triage room. We may "decid[e] which of the two prongs of the [QI] analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). For the excessive force claim, we start and end with the second prong: "whether the right at issue was clearly established at the time of [the officers'] alleged misconduct." *Id.* at 232.

Rich has not demonstrated that the officers violated clearly established

---

[10] *See Sullivan*, 106 F. App'x at 221 (holding that officers who took a man into custody to commit him for a mental screening at the behest of their supervisor, who was relying on the statements of a psychiatrist, lawfully detained the man under Texas law); *see also Martinez¸* 1999 WL 1095667, at *2 (holding that officers "had probable cause to take [plaintiff] into protective custody" "[b]ased on the Texas statute, the information from a third party, and their own observations").

law by moving Dupuis-Mays—who was increasingly aggravated, repeatedly spitting at the officers, and failing to comply with instructions to stop—to the floor, even though he collided with a cabinet on the way down. The cases Rich cites on appeal do not implicate the situation Palko and Hudgens faced and certainly do not put it "beyond debate," *al-Kidd*, 563 U.S. at 741, that the officers' actions violated Dupuis-Mays's rights. Instead, those decisions concern the use of deadly force,[11] repeatedly striking an arrestee,[12] tackling an arrestee and pummeling him with the officers' "knees and fists,"[13] slamming a subdued arrestee into a car window with enough force to break two teeth,[14] tackling a moving suspect,[15] and catching a fleeing suspect and then repeatedly tasing him and slamming him on the ground.[16]

Rich has failed to identify precedent clearly establishing that the officers' conduct violated Dupuis-Mays's constitutional rights on the excessive force claim. The officers are entitled to QI.

## C.

The officers contend that they deserve QI on Rich's claim that the officers

---

[11] *Cole v. Carson*, 905 F.3d 334, 343 (5th Cir. 2018), *vacated for reh'g en banc*, 915 F.3d 378 (5th Cir. 2019).

[12] *Brown v. Lynch*, 524 F. App'x 69, 72–73 (5th Cir 2013) (unpublished).

[13] *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017).

[14] *Bush v. Strain*, 513 F.3d 492, 496 (5th Cir. 2008).

[15] *Goodson v. City of Corpus Christi*, 202 F.3d 730, 733–34 (5th Cir. 2000).

[16] *Anderson v. McCaleb*, 480 F. App'x 768, 769 (5th Cir. 2012) (per curiam). The district court found that *Brady v. Louisiana*, No. 92-3904, 1993 U.S. App. LEXIS 39564 (5th Cir. 1993) (unpublished but precedential), "along with several other cases in this Circuit, provide clearly established law that lesser levels of force are excessive *against restrained, non-threatening persons*." Rich cites those "other cases," and we have already found them inapposite. *Brady* involved a prison guard's hitting a restrained inmate, *id.* at *2, and does not provide the kind of precedent "that defines the contours of the right in question with a high degree of particularity," *Morgan*, 659 F.3d at 372.

violated Dupuis-Mays's constitutional rights by preparing false police reports "to support the unlawful arrest." Neither the district court nor Rich has identified which of Dupuis-Mays's constitutional rights was violated. The court explained only that "these reporting falsities obstructed the investigation regarding the incident and continue to serve as a potential basis for the justification of the alleged unlawful detention and use of excessive force," and accordingly, "are proper matters for a jury to review."[17]

Rich's theory appears to be that Hudgens's inaccurate post-incident report was designed to provide probable cause to support a warrantless detention. But Rich fails to identify a single case suggesting that an individual has a right to be free from inaccuracies in an after-the-fact police report or that an inaccurate report serves as a sort of continuing constitutional violation, as the district court suggested. The only case from this circuit that the magistrate judge cited is to the contrary.[18] Consequently, Rich has not shown a violation of a clearly established constitutional right, and the officers are entitled to QI.

The order denying QI is REVERSED, and a judgment of dismissal with prejudice is RENDERED.

---

[17] The magistrate judge similarly found "these reporting falsities to be consequential to Plaintiff's unlawful detention and excessive force claims, and that a jury could find the false statements were intentionally made by Defendant Officers."

[18] *See Smith v. Patri*, 99 F. App'x 497, 498 (5th Cir. 2004) (per curiam) ("[T]here is no right to a completely accurate police report."). Other circuits have also recognized that false or inaccurate police reports do not pose a constitutional violation. *See, e.g.*, *Jarrett v. Twp. of Bensalem*, 312 F. App'x 505, 507 (3d Cir. 2009) ("[T]he mere existence of an allegedly incorrect police report fails to implicate constitutional rights.").