# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
April 6, 2021

Lyle W. Cayce
Clerk

No. 20-30052

Mark David Cloud; Patti Brandt Cloud,

*Plaintiffs—Appellants*,

*versus*

Mike Stone, *Lincoln Parish Sheriff*; Kyle Elliott Luker, *Deputy Sheriff*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:18-CV-1070

Before Smith, Willett, and Duncan, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Lincoln Parish Deputy Sheriff Kyle Luker tased and then shot and killed Joshua Cloud while trying to arrest him during a traffic stop. Cloud's parents sued Luker for excessive force, but the district court granted Luker summary judgment after finding no constitutional violation. Like the district court, we conclude Luker reasonably deployed his taser when Cloud continued to resist arrest. We also conclude Luker justifiably used deadly force when Cloud lunged for a revolver that had already discharged and struck Luker in the chest. The district court's judgment is affirmed.

No. 20-30052

# I

Around midday on August 29, 2017, Deputy Luker observed Cloud speeding on I-20 in Simsboro, Louisiana.[1] Luker followed Cloud off the interstate and pulled him over on Highway 80, across the street from Simsboro High School. When Luker wrote Cloud a ticket for driving 13 m.p.h. over the speed limit, Cloud protested that Luker could not possibly have seen him on the interstate. Cloud refused to sign his ticket, which is grounds for arrest under Louisiana law. *See* LA. STAT. ANN. § 32:391(B).

Luker attempted to arrest Cloud. He had Cloud exit his pickup truck and face its side with his hands behind his back. Standing behind Cloud, Luker handcuffed his left wrist, at which point Cloud turned partially around to his left. (Plaintiffs contend Cloud turned around, not to keep arguing, but because he had a hearing impairment. We address that assertion below. *See infra* Section III.A & n.9.) Luker ordered Cloud to turn back around and reached for his right hand to finish handcuffing him. But Cloud then spun all the way around, turning away from Luker's reach and facing him head-on, with the handcuffs hanging from his left wrist.

With Cloud now facing him, Luker stepped a few feet back and tased Cloud in the chest. Though both taser prongs hit Cloud and began cycling, they did not incapacitate him. Cloud yelled and pulled the prongs from his chest. Luker then released his police dog from his car with a remote button

---

[1] The factual record comes principally from the testimony of Deputy Luker, Deputy Taff Randall Watts, and a bystander witness named Quinton Crowe, as well as physical evidence and a cellphone video Crowe recorded from some distance away that captured parts of the incident. *See infra* note 4.

No. 20-30052

and tried to regain control of Cloud. Luker grabbed Cloud around the waist and tased him again, now with the taser in "drive-stun" mode.[2]

The two men, grappling with each other, moved toward the truck's open door. Cloud produced a revolver from somewhere near the driver's seat.[3] As the two struggled for control of the gun, it discharged twice, the second shot hitting Luker in the chest. Luker was in pain but unable to tell how badly he was injured: as it turned out, his protective vest spared him all but a minor injury. As the struggle continued, Luker managed with one hand to radio police dispatch that shots had been fired. Luker was then able to wrest the revolver out of Cloud's hands and throw it to the ground on the street behind him. With Cloud disarmed and the police dog now engaging, Luker drew back a short distance, withdrew his duty weapon, and ordered Cloud to get on the ground.

At this point, Cloud was crouching in his truck's doorway, keeping the dog at arm's length with his hand on the dog's head. Cloud's revolver was on the ground, behind Luker and to his left. Then, according to Luker, Cloud rushed toward him—"directly at [his] chest or to [his] left a little bit"—and started to move past him. Luker turned to his left, with Cloud's shoulder brushing across his chest. As Cloud lunged toward the revolver lying on the ground, Luker fired two shots into Cloud's back. Cloud was pronounced dead at the scene shortly thereafter.[4]

---

[2] When taser prongs are deployed, they conduct an electric current that can immobilize a person by causing his muscles to seize up. A taser in drive-stun mode inflicts a painful electric shock on contact, but does not cause the same seizing effect.

[3] Luker testified that he first saw the gun in Cloud's hand underneath the steering wheel.

[4] The altercation was partially captured on a cellphone video taken from across the street by Quinton Crowe, a Simsboro High employee on a cigarette break. The video shows the struggle in the car door, cuts out, then picks up when Luker is aiming his gun at Cloud,

No. 20-30052

Cloud's parents ("Plaintiffs") filed suit in federal district court against Luker, Lincoln Parish Sheriff Mike Stone, and Lincoln Parish District Attorney John Belton, the latter two in their official capacities. They alleged excessive force claims under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments, state-law survival and wrongful death claims, and disability discrimination claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Belton was voluntarily dismissed, and the remaining Defendants moved for summary judgment, which the district court granted as to all claims.

As relevant here, the court held Luker did not use excessive force. First, it found his taser use reasonable, primarily because a reasonable officer would have believed that Cloud was resisting arrest at the time. Second, it found that shooting Cloud was not excessive force because Luker reasonably believed Cloud posed an immediate threat of serious harm. Finally, the court found that, assuming *arguendo* a constitutional violation, Luker would still be entitled to qualified immunity because he did not violate clearly established law. The court therefore dismissed all claims with prejudice, and Plaintiffs appealed.[5]

---

who is crouching in the open truck door. The video again cuts out momentarily before the gunshots. It next shows Cloud lying on the ground, near where his revolver had previously come to rest. Crowe testified that he did not see the shots, but only saw Cloud on the ground afterwards.

[5] The court likewise granted summary judgment on the official-capacity claims against Sheriff Stone, all state law claims, and the ADA claim. Plaintiffs appeal only the dismissal of their excessive force claim against Luker and have therefore abandoned their other claims. *See Robertson v. Intratek Comput., Inc.*, 976 F.3d 575, 579 n.1 (5th Cir. 2020), *petition for cert. filed* (U.S. Mar. 1, 2021) (No 20-1229).

No. 20-30052

## II

"We review a summary judgment *de novo*, applying the same standards as the district court." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019). "The movant must show 'there is no genuine dispute as to any material fact and [he is] entitled to judgment as a matter of law.'" *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (quoting FED. R. CIV. P. 56(a)), *cert. denied*, No. 20-498, 2021 WL 78130 (U.S. Jan. 11, 2021). "However, a good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Ibid.* (quoting *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 376 (2020) (cleaned up)). "We still draw all inferences in the plaintiff's favor." *Ibid.* (citation omitted).

## III

To rebut Luker's qualified immunity defense, Plaintiffs must point to summary judgment evidence "(1) that [Luker] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)), *cert. denied*, 140 S. Ct. 388 (2019). "We can analyze the prongs in either order or resolve the case on a single prong." *Garcia*, 957 F.3d at 600 (citing *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019)). Here, prong one resolves the case. We address separately Luker's taser use and his subsequent shooting of Cloud, in that order.

## A

Plaintiffs claim that Luker's nonlethal force—first tasing Cloud from a few feet away, then using his taser in drive-stun mode while grappling with Cloud—violated Cloud's Fourth Amendment right against excessive force during an arrest. We disagree.

No. 20-30052

An officer violates the Fourth Amendment when an arrestee "suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989). "Crucially, this analysis must be objective: To make out a Fourth Amendment violation . . . 'the question is whether the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting [him], without regard to their underlying intent or motivation.'" *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Graham*, 490 U.S. at 397) (cleaned up). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

*Graham* identifies several factors bearing on the reasonableness of force: with "careful attention to the facts and circumstances of each particular case," courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid.* We consider "not only the need for force, but also the relationship between the need and the amount of force used." *Joseph*, 981 F.3d at 332 (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)) (internal quotation marks omitted). Faced with an uncooperative arrestee, officers properly use "measured and ascending actions that correspond to [the arrestee's] escalating verbal and physical resistance." *Id.* at 332–33 (quoting *Poole*, 691 F.3d at 629) (cleaned up).

Of the factors identified in *Graham*, the extent of Cloud's resistance is the most important to analyzing Luker's use of his taser. The other two factors—the "severity of the crime at issue" and the "immediate threat to the safety of the officers or others"—are less illuminating. Cloud was suspected of only a minor offense, at least before resisting arrest. On the other

6

hand, Luker was the lone officer on the scene, and Cloud's confrontational manner, culminating in his turning around to face Luker squarely (with one hand uncuffed and the door of his truck open next to him) created some threat to the officer's safety. The parties chiefly dispute the degree to which Cloud was resisting arrest when Luker deployed his taser.

Our cases on police use of tasers have paid particular attention to whether officers faced active resistance when they resorted to a taser. Where, as here, the severity of crime and immediate safety threat are relatively inconclusive, a suspect's active resistance to arrest may justify this degree of force. For example, we have held that two officers were reasonable to tase an arrestee because he had "aggressively evaded [their] attempts to apprehend him," and because they did so after the arrestee "continuously failed to comply," other "efforts to subdue [him] were ineffective," and the arrestee had "continued to resist handcuffing" and "kicked an officer after being taken to the ground." *Pratt v. Harris Cnty.*, 822 F.3d 174, 182 (5th Cir. 2016). In that case, we took as further evidence of "measured and ascending" action that "neither officer used [his] taser as the *first method* to gain [the arrestee's] compliance." *Ibid.*; *see also Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him."). In another case—one not involving a taser but nonetheless relevant—we held that an officer reasonably pushed an arrestee onto the hood of a police cruiser, causing some bruises and chest pain, because the arrestee "resisted when [the officer] attempted to place handcuffs on him." *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009). Specifically, the arrestee had "pulled his hand back and turned away from the officer," then grappled with him briefly. *Id.* at 216.

By contrast, we have found excessive force when officers tased someone offering only passive resistance or no resistance at all. For example,

we held that officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an "off-color joke." *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012). Under those circumstances, police could not "immediately resort[] to taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Id.* at 763. In another case, we found excessive force when an officer tased someone who did no more than pull his arm out of the officer's grasp, and who was not even suspected of a crime up to that point. *Ramirez v. Martinez*, 716 F.3d 369, 372, 378 (5th Cir. 2013); *see also Trammell v. Fruge*, 868 F.3d 332, 341–42 (5th Cir. 2017) (arrestee pulling his arm away from officer's grasp did not alone justify two officers' tackling him to the ground). Likewise, we recently found excessive force when officers repeatedly beat and tased a man who "was not suspected of committing any crime, was in the fetal position, and was not actively resisting." *Joseph*, 981 F.3d at 336; *see also id.* at 335 ("If Joseph was not actively resisting, [officers] inflicted force beyond what the Fourth Amendment permits.").[6]

---

[6] Other circuits addressing police tasing have drawn a similar line between actively and passively resisting subjects. Cases generally "adhere to this line: If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012); *see id.* at 509–10 (collecting cases); *see also Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (reasonable to tase suspect who "used profanity, moved around and paced in agitation, and repeatedly yelled at [officer]" while refusing series of verbal commands); *Meyers v. Baltimore Cnty.*, 713 F.3d 723, 733–34 (4th Cir. 2013) (tasers were reasonable while arrestee "posed an immediate threat to the officers' safety, and was actively resisting arrest," but excessive after threat and active resistance relented); *Brown v. City of Golden Valley*, 574 F.3d 491, 497–98 (8th Cir. 2009) (excessive to tase suspect "who had disobeyed two orders to end her phone call with a 911 operator"); *but see Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir. 2011) (en banc) (tasing of woman was excessive when she "actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the

No. 20-30052

The record in this case shows that Cloud actively resisted arrest, which gave Luker reasonable grounds to tase him. While Cloud's left hand was being handcuffed, he turned partially around. Luker responded by commanding Cloud to turn back around. But when Luker reached for Cloud's right hand, Cloud turned to face him, with the handcuffs dangling from his left wrist. In other words, Cloud took a confrontational stance, deprived Luker of the use of his handcuffs, and thwarted efforts to complete the arrest. *Cf. Collier*, 569 F.3d at 216, 219 (reasonable to use force on arrestee who "physically resisted when [officer] attempted to place handcuffs on him"). Up to then, Luker had addressed Cloud's general uncooperativeness and modest resistance with verbal commands and milder force. But at this juncture things took a more serious turn, making Luker's resort to his taser reasonable.

Plaintiffs argue that Cloud's resistance was merely passive, but this mischaracterizes the record. Cloud was more than merely uncooperative or argumentative: his actions—not just his failure to follow directions— prevented Luker from completing a lawful arrest. This conduct compares unfavorably with our passive-resistance cases, as well as those of other courts. In *Newman*, for example, we found a man's resistance was passive when he did not disobey any commands and at most pushed himself backwards off a car after officers struck him. 703 F.3d at 762–63. Likewise, in *Ramirez*, we found passive resistance when a man not yet under arrest or any suspicion exchanged angry words with an officer and pulled his arm out of the officer's grasp. 716 F.3d at 372, 378; *see also, e.g.*, *Brown v. City of Golden Valley*, 574

---

officers' efforts to remove her from her car."); *id.* at 451 (same, where subject "minimally resisted [another person's] arrest while attempting to protect her own body").

No. 20-30052

F.3d 491, 494, 497 (8th Cir. 2009) (passive resistance where passenger in pulled-over car refused command to hang up her phone).

Plaintiffs also argue that Cloud was only turning around to read Luker's lips due to Cloud's hearing impairment.[7] But we measure excessive force by the objective circumstances, not by the subjective intentions of the arrestee. *Graham*, 490 U.S. at 397. Luker testified he did not know Cloud had any hearing problem, and Plaintiffs have pointed to no evidence suggesting he should have known. To the contrary, Cloud was not wearing hearing aids at any point while in Luker's view and had previously communicated with Luker without any apparent difficulty.[8] Even if Plaintiffs' assertion about Cloud's reason for turning around is correct, it does not change the objective excessive-force analysis.

Finally, Plaintiffs argue that even if Luker's initial tase was justified, his subsequent drive-stun maneuver was excessive. It is true that the same incident can include both lawful and unlawful uses of force. *See, e.g.*, *Carroll v. Ellington*, 800 F.3d 154, 174, 176–78 (5th Cir. 2015) (granting qualified immunity for one officer's initial taser use but not others' subsequent uses of force); *Joseph*, 981 F.3d at 335 ("Force must be reduced once a suspect has been subdued."). Because Luker's initial tase had no effect, however, the circumstances justifying force were still present during the drive-stun tasing. Plaintiffs have not pointed to evidence that Cloud complied with any commands or ceased to resist arrest after the first tase. Although Plaintiffs

---

[7] Plaintiffs offered testimony of two lay witnesses regarding this hearing impairment.

[8] Plaintiffs offered a video presentation Cloud made some time before the incident and, based on this, argue that his speech pattern would have demonstrated to a reasonable listener that he was hearing-impaired. The district court correctly found, however, that this video did not raise a genuine dispute as to whether Luker reasonably should have known that Cloud was hearing-impaired.

suggest that only a few seconds elapsed between Luker's initial tase and his drive-stun maneuver, the situation remained "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. Under these circumstances, Luker's continued force to complete the arrest, like his initial tase, was reasonable.

**B**

We next address whether Luker's use of lethal force was excessive. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009). Our precedent teaches that officers use lethal force justifiably if they reasonably believe the individual is reaching for a gun. *See, e.g.*, *Salazar-Limon v. City of Houston*, 826 F.3d 272, 278–79 (5th Cir. 2016). We have adhered to this standard even in cases when officers had not yet seen a gun when they fired, or when no gun was ever found at the scene. *See, e.g.*, *Manis v. Lawson*, 585 F.3d 839, 844–45 (5th Cir. 2009); *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991). To show a triable issue, a plaintiff must generally "present[] competent summary judgment evidence that [the arrestee] did not reach . . . for what [the officer reasonably] perceived to be a weapon." *Salazar-Limon*, 826 F.3d at 278.

It is evident from the record that Luker could have reasonably believed that Cloud threatened him with serious physical harm. At a minimum, Luker knew that a loaded revolver lay on the ground behind and to his left. More than that, though, he knew that the gun had just discharged twice—once into his chest—and that he had had to wrest it from Cloud's hands and toss it away. Finally, he saw Cloud make a sudden move in the gun's direction. Even drawing all inferences in Plaintiffs' favor, the record shows that Cloud was shot while moving toward the revolver and potentially seconds from

No. 20-30052

reclaiming it.[9] Plaintiffs contend Cloud was likely trying to flee, not to regain the revolver, but even if true, that would be irrelevant. Whatever Cloud's intentions, the circumstances warranted a reasonable belief that Cloud threatened serious physical harm. The lethal force was therefore not constitutionally excessive.

## IV

Because we find no constitutional violation, we need not reach prong two of the qualified immunity defense and consider whether Luker violated any clearly established law.

AFFIRMED.

---

[9] As noted, the cellphone video footage does not show Cloud's movement or Luker's shots due to a gap in the recording, but the video confirms that both occurred within a four-second span. Luker testified that Cloud lunged across the officer's chest as Luker turned to his left and fired two shots. Analysis by Plaintiffs' forensic consultant corroborates this story: he concluded that Cloud's wounds showed he was shot at point-blank range in the left posterior flank and middle back. Video frames also show that after the shots, Cloud was lying on the ground to the left of Luker's initial position, near where the revolver had been lying earlier.