# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 11, 2022

Lyle W. Cayce
Clerk

No. 21-30101

Timothy Betts, Sr.,

*Plaintiff—Appellee*,

*versus*

Ross Brennan; Louisiana State Police; Department of Public Safety and Corrections,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-14680

Before Owen, *Chief Judge*, and Clement and Duncan, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

During a routine traffic stop, Timothy Betts repeatedly challenged Officer Ross Brennan's reasons for stopping him, refused to comply with his orders, batted his hand away, called him a liar, warned him to call in backup, and dared him to use his taser. After going round-and-round like this for several minutes, Brennan tased Betts once and arrested him. Betts pled guilty to resisting arrest. He then sued Brennan for using excessive force. The district court denied Brennan qualified immunity. We reverse and remand.

# I.

# A.

Early in the afternoon of November 23, 2018, Officer Brennan stopped Betts for speeding. Brennan exited his cruiser and asked Betts to exit his truck. Initially, Betts complied. Once Betts was outside the truck, Brennan explained he had stopped Betts for going thirteen miles per hour over the speed limit. Betts immediately disagreed, arguing there was "no way" he was going that fast. After a short exchange, Betts sat back down in the driver's seat of the truck. Although continuing to maintain he had not been speeding, Betts remarked: "That's fine, I ain't going to argue with you." Brennan asked Betts for his license, insurance, and registration while Betts sat in the truck, angled toward Brennan.

Betts, continuing to argue about the stop, handed the documents to Brennan. Brennan then stepped away from the truck, creating distance between himself and Betts, and asked Betts to stand at the back of the truck. Betts refused, saying: "I'm fine . . . I'm not causing you no threat . . . ." Brennan moved slightly closer and, over Betts's protests, told him to "go walk to the back of the truck or I'm going to make you walk to the back of the truck." Betts replied that Brennan had no reason or authority to order him to do that. This exchange continued for several seconds, with Brennan repeatedly commanding Betts to walk to the back of the truck and Betts refusing. Betts then told Brennan: "I'm not disobeying . . . I'm not causing you no threat. I've done this before." Brennan responded by stating: "For my safety and your safety, I'm asking you to step to the back of the truck."

Betts began shouting that Brennan was lying. Brennan disagreed. Amid this verbal struggle, Betts told him: "If you tase me, I'm going to sue you." Betts repeated he was "not being aggressive" and "not even reaching for [his] phone." As the argument continued, Brennan leaned closer to the

truck and grasped Betts's arm while again ordering him to exit. Betts jerked his arm away and told Brennan not to touch him. He again stated he did not have to exit the truck and claimed Brennan was becoming aggressive. At the same time, Betts slung one foot out of the vehicle. Brennan again tried to approach Betts, and Betts kicked his foot out, stood up to exit, and clenched his fist. While doing so, Betts told Brennan he "might want to call [his] people."

Again stepping away from the truck, Brennan shouted to Betts to turn around and put his hands behind his back. Betts stood near the driver's compartment at a 45-degree angle away from Brennan with his hands raised over his head. Brennan repeatedly ordered Betts to put his hands behind his back, and after several commands Betts did so. Brennan then repeatedly told Betts to turn and face him. Betts did not do so but instead kept his body at an angle. Brennan repeated this command several more times, warning Betts that he would tase him if Betts did not comply. When Betts did not comply, Brennan deployed his taser, hitting Betts in the upper leg.

Betts screamed and fell to the ground. Brennan ordered Betts to turn over on his stomach, and Betts complied. Brennan then handcuffed Betts, warning that if he continued to resist Brennan would tase him again. As Brennan handcuffed Betts and sat him up, Betts began shouting profanities: "You just damn shot me for fucking nothing . . . you owe me, you fucked up . . . I'm getting something out of this . . . ." The entire encounter—from the initial stop to Betts's arrest—lasted about four minutes. Betts later pled guilty to resisting arrest.

## B.

Betts sued Brennan, the Louisiana State Police ("LSP"), and the Louisiana Department of Public Safety and Corrections ("DPSC") in state

court.[1] He alleged violations of the Fourth Amendment and Louisiana law.[2] The defendants removed the case to federal court and subsequently moved for summary judgment.[3] Brennan invoked qualified immunity. He argued that his single tase of Betts was both a reasonable amount of force under the circumstances and not forbidden by clearly established law.

The district court denied Brennan summary judgment. It concluded his use of force was objectively unreasonable under the Fourth Amendment because Betts had been stopped for a minor traffic infraction, posed no threat or flight risk, and was "at most" passively resisting when he was tased. The court also found Brennan's actions were clearly established as unlawful by our decision in *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017), which the court found factually indistinguishable.

Brennan timely appealed.

## II.

Under the collateral order doctrine, we have limited jurisdiction to review a summary judgment denial based on qualified immunity. *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). We review the district court's order "only 'to the extent that [it] turns on an issue of law.'" *Juarez v. Aguilar*, 666 F.3d 325, 331 (5th Cir. 2011) (quoting *Kinney*, 367 F.3d at 346). That is, we consider "the purely legal question whether a given course of conduct would be

---

[1] Although named separately, LSP and DPSC are not separate entities.

[2] His state claims include assault, battery, and negligent and intentional infliction of emotional distress. Because the district court's order did not address Betts's state claims, we do not address them here.

[3] They also argued Betts's claims were precluded by *Heck* because he pled guilty to resisting arrest. *See Heck v. Humphrey*, 512 U.S. 477, 483 (1994)). Additionally, DPSC argued it was not a "person" suable under § 1983. Neither of those issues is before us.

objectively unreasonable in light of clearly established law." *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013) (quoting *Kinney*, 367 F.3d at 346–47). Our review is *de novo*. *Ibid.* (citation omitted). By contrast, we lack jurisdiction to review whether there are genuine fact disputes. *Id.* at 730 (citation omitted). Where such disputes exist, "we accept the plaintiffs' version of the facts as true." *Id.* at 731 (quoting *Kinney*, 367 F.3d at 348).

This case involves no disputed facts because the encounter was captured on Officer Brennan's bodycam.[4] *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (a court reviewing a summary judgment denial based on qualified immunity "should . . . view[] the facts in the light depicted by the videotape"). That video "clearly show[s] . . . every particular element of the altercation," *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013), and no party contests its "accuracy or completeness." *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021) (citation omitted). Therefore, while viewing the evidence favorably to the nonmovant, "we assign greater weight, even at the summary judgment stage, to the . . . video recording[] taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

## III.

An officer merits qualified immunity unless (1) he "violated a statutory or constitutional right of the plaintiff" and (2) "the right was clearly established at the time of the violation." *Dyer v. Houston*, 964 F.3d 374, 380

---

[4] *See* https://www.ca5.uscourts.gov/opinions/pub/21/21-30101-bodycam.mp4. It was also captured by a security camera outside the building where the stop took place. *See* https://www.ca5.uscourts.gov/opinions/pub/21/21-30101-repairshop.mp4. The panel has carefully reviewed this footage.

(5th Cir. 2020) (citation omitted). Officer Brennan argues the district court erred on both prongs. We agree.

## A.

Prong one asks whether Brennan's tasing Betts violated the Fourth Amendment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014). This happens when an arrestee "suffers an injury that results directly and only from [the officer's] clearly excessive and objectively unreasonable use of force." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citation omitted); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989). Our vantage point is "the perspective of a reasonable officer on the scene, rather than . . . the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Various factors guide the analysis, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid.* Additionally, we consider "the relationship between the need [for force] and the amount of force used." *Joseph*, 981 F.3d at 332 (cleaned up) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)). Facing an uncooperative arrestee, officers properly use "measured and ascending actions that correspond to [the arrestee's] escalating verbal and physical resistance." *Id.* at 332–33 (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)) (cleaned up).

Of the *Graham* factors, the extent of Betts's resistance is the most important to analyzing Brennan's use of his taser. The other two factors—the "severity of the crime at issue" and the "immediate threat to the safety of the officers or others"—are less salient. Betts was stopped for only a minor traffic offense. On the other hand, Brennan was the lone officer on the scene, and Betts's persistently confrontational manner created some threat to the officer's safety. *Cf. Cloud v. Stone*, 993 F.3d 379, 384–86 (5th Cir. 2021)

(similar situation during traffic stop that resulted in officer shooting). The parties chiefly dispute the degree of Betts's resistance. Indeed, this was the main ground for the district court's rejecting Brennan's argument—namely, that when tased Betts was "at most, passively resisting."

That reasoning misapplies our excessive-force precedents. True, we "have paid particular attention to whether officers faced active resistance when they resorted to a taser." *Cloud*, 993 F.3d at 384. But the line between active and passive resistance is sometimes hazy and must be judged in light of the "necessarily fact-intensive" nature of the inquiry. *Deville*, 567 F.3d at 167. For instance, we have found tasing excessive when an arrestee "did no more than pull his arm out of the officer's grasp." *Cloud*, 993 F.3d at 385 (citing *Ramirez*, 716 F.3d at 372, 378; *Trammel v. Fruge*, 868 F.3d 332, 341–42 (5th Cir. 2017)). We have also said "officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an 'off-color joke.'" *Ibid.* (citing *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012)). On the other hand, we have found tasing not excessive where a suspect "resists arrest or fails to follow police orders" or "resist[s]" an officer's attempt to handcuff him. *Ibid.* (citing *Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013) (per curiam); *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009)). And we have relied on another circuit's decision finding tasing justified when an arrestee "'used profanity, moved around and paced in agitation, and repeatedly yelled at [an officer]' while refusing a series of verbal commands." *Id.* at 385 n.6 (alteration in original) (quoting *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)).

Measured against these cases, we disagree that Betts's resistance was "at most passive." Betts did not just mouth off at Brennan, ignore one of his orders, or move away from his grasp. Rather, as the video shows, Betts adopted a confrontational stance at the outset and things got worse from

there. Betts repeatedly contested why he was stopped, ignored dozens of Brennan's commands, disputed Brennan's authority, accused him of lying, batted away his hand, warned Brennan to call other officers, and dared Brennan to tase him. Most importantly, Betts repeatedly disputed Brennan's power to order him to stand behind the truck. Faced with an angry driver, Brennan reasonably wanted to get Betts away from the driver's compartment where a weapon might easily be hidden.[5] Yet, after Brennan told Betts this order was "for my safety and for your safety," Betts retorted: "Come on, that's a lie."

Other factors show Brennan's use of force was reasonable. For instance, he did not tase as a first resort. That is, he did not "immediately resort[] to [the taser]...without attempting to use physical skill, negotiation, or even commands." *Newman*, 703 F.3d at 763; *see also Trammell*, 868 F.3d at 342 ("This Court has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need."). To the contrary, Brennan "properly use[d] 'measured and ascending actions that correspond[ed] to [Betts's] escalating verbal and physical resistance.'" *Cloud*, 993 F.3d at 384 (quoting *Joseph*, 981 F.3d at 332–33). Brennan tried to get Betts to stand behind the truck by invitation, explanation, command, and even by grasping his arm. And Brennan warned Betts more than once that he would be tased if he did not comply with his orders. Only when all those lesser options appeared to have failed did Brennan use his taser.

---

[5] *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (observing that "traffic stops may be dangerous encounters" and that "[i]n 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops" (citation omitted)); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6 (1977) (given "legitimate concerns for the officer's safety," during a lawful stop "officers may order the driver to get out of the vehicle without violating the Fourth Amendment[]").

Furthermore, Brennan tased Betts only once. That was enough to subdue Betts and allow Brennan to handcuff him. At that point, additional force was not necessary and Brennan did not use any (although he did warn Betts that further resistance would be met with another tase). This shows a reasonable "relationship between the need [for force] and the amount of force used." *Joseph*, 981 F.3d at 332 (citation omitted); *see also Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." (citation omitted)); *cf. Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005) (per curiam) (finding excessive force where officer "continued to tase [arrestee] repeatedly, even after she was subdued on the ground").

In sum, we conclude that Officer Brennan did not violate the Fourth Amendment by tasing Betts one time in order to arrest him.

**B.**

Even assuming a Fourth Amendment violation, prong two of the qualified immunity analysis asks whether the right was "clearly established at the time." *District of Columbia v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 589 (2018) (citation omitted). "[A] right is 'clearly established' only if it 'is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). To give officers that notice, the relevant law must not be "define[d] . . . at a high level of generality," but instead with specificity. *See Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018) (citations omitted); *see also Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019) ("[W]e must frame the constitutional question with specificity and granularity."). "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes

difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Rivas-Villegas v. Cortesluna*, --- U.S. ---, 142 S. Ct. 4, 8 (2021) (alteration in original) (quoting *Mullenix*, 577 U.S. at 12). Consequently, "officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct at 1152 (citation omitted); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (recognizing qualified immunity yields only if relevant precedent "ha[s] placed the . . . constitutional question beyond debate").

The district court reasoned the unlawfulness of Brennan's single tase was clearly established by our decision in *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017). While *Hanks* shares some similarities with the situation Brennan faced, there are significant differences. We therefore disagree with the district court that *Hanks* placed the excessiveness of Brennan's tase "beyond debate." *al-Kidd*, 563 F.3d at 741.[6]

In *Hanks*, an officer stopped Hanks and ordered him to exit his vehicle. 853 F.3d at 741. After arguing for about a minute, Hanks eventually complied with the officer's orders to walk behind the vehicle, place his hands on the trunk, and put his hands behind his head. *Id.* at 742. Standing behind Hanks with taser drawn, the officer then ordered Hanks to "go to [his] knees." *Ibid.* Hanks responded "for what?" and asked whether he was under arrest, but the officer only repeated his command. *Ibid.* Hanks then "made a small lateral step with his left foot," his hands remaining behind his back. *Ibid.* The officer suddenly "rushed towards Hanks and administered a blow to Hanks's upper back or neck," knocking him onto the trunk and to the

---

[6] We "assum[e] that [c]ircuit precedent can clearly establish law for purposes of § 1983." *Rivas-Villegas*, 142 S. Ct. at 8.

ground. *Id.* at 743. Hanks was then handcuffed and issued a traffic ticket. *Ibid.* A police investigation later determined that Hanks was "compliant," that the officer failed to communicate whether Hanks was under arrest, and that the blow to Hanks's back was "not objectively reasonable . . . based on [Hanks's] lack of resistance." *Ibid.*

Our court denied the officer qualified immunity because his "suddenly resorting to physical force" was "clearly excessive and clearly unreasonable." *Id.* at 745. We relied on the fact that Hanks's resistance was "at most, passive, . . . consist[ing] chiefly of remaining on his feet for about twenty seconds" after the order to kneel. *Id.* at 746 (citation omitted). Moreover, Hanks's "small lateral step," which provoked the blow, "was not accompanied by any obvious signs of violence or flight," nor did Hanks "turn his body or move his hands, which remained folded behind his back and plainly visible." *Ibid.* Finally, we found it clearly established law that an officer cannot "abruptly resort[] to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." *Id.* at 747.[7]

For many reasons, *Hanks* did not settle "beyond debate" whether Brennan's use of force was constitutionally excessive. *al-Kidd*, 563 F.3d at 741. First, although he did argue initially with the officer, Hanks complied with his order to walk behind his car. *Hanks*, 853 F.3d at 741–42. By contrast, Betts repeatedly resisted a similar order and remained near the

---

[7] For those propositions, the panel principally relied on *Deville*, 567 F.3d 156. In that case, a driver stopped for speeding refused the officer's order to exit her vehicle because, she claimed, she did not want to leave her two-year-old grandchild in the car. *Id.* at 161–62, 167. Instead of negotiating with the driver, the officer "quickly resorted to breaking her driver's side window, . . . dragg[ed] her out of the vehicle," and "threw her up against the vehicle." *Id.* at 162, 168.

driver's compartment. Second, Hanks offered no physical resistance. *Id.* at 742–43. But Betts batted the officer's hand away and said, "Don't touch me." Third, Hanks merely asked the officer questions, like whether he was under arrest or why he had to "go to his knees." *Id.* at 742. Betts did much more: he warned the officer to call in backup, accused him of lying, and dared him to use his taser. Fourth, Hanks was blindsided by an abrupt and unwarned blow to his back. *Id.* at 743. Betts, though, was repeatedly warned he would be tased and was tased only after failing to comply with numerous orders. Fifth and finally, a police investigation found that Hanks was "compliant," that the officer's blow was unreasonable, and that "a Taser Deployment" might have been reasonable. *Id.* at 743, 749 n.10. By contrast, Betts was repeatedly noncompliant, was tased and not struck, and later pled guilty to resisting arrest.

These multiple factual distinctions matter because, as *Hanks* itself recognized, "[e]xcessive force claims are necessarily fact-intensive" and turn on "the facts and circumstances of each particular case." *Id.* at 745 (citations and internal quotation marks omitted). *Hanks* therefore did not place "beyond debate" whether Brennan's single tase of Betts violated the Fourth Amendment. *al-Kidd*, 563 F.3d at 741. The district court erred in concluding otherwise.

## IV.

We REVERSE the district court's denial of summary judgment and REMAND for further proceedings consistent with this opinion.