# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 7, 2023

Lyle W. Cayce
Clerk

No. 22-40196

_____

Rodney Guerra,

*Plaintiff—Appellant*,

*versus*

Baudelio Castillo; City of Alamo, Texas,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:20-CV-401

_____

Before Richman, *Chief Judge*, and King and Higginson, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Rodney Guerra, formerly a patrol sergeant in the Alamo, Texas police department, brought a § 1983 action against the City of Alamo (the "City"), former chief of police Baudelio Castillo, and several other officers in connection with an alleged scheme to have Guerra fired and arrested on bogus charges. The district court dismissed the City and the other officers under Federal Rule of Civil Procedure 12(b)(6), then dismissed Castillo under 12(c). Guerra appeals the dismissals of Castillo and the City. We

REVERSE the dismissal of Castillo, AFFIRM the dismissal of the City, and REMAND for further proceedings.

## I.

In reciting the following allegations from Guerra's complaint, we "accept all facts as pleaded and construe them in the light most favorable to [Guerra]." *Crane v. City of Arlington*, 50 F.4th 453, 461 (5th Cir. 2022); *Vardeman v. City of Hous.*, 55 F.4th 1045, 1049 (5th Cir. 2022) ("The Rule 12(c) standard is the same as that applied to Rule 12(b)(6).").

Guerra was promoted to sergeant in the patrol department of the City's police department in the first half of 2018. In July of 2018, a subordinate patrol officer arrested a suspect for driving while intoxicated and the suspect spat on the officer's face. But the suspect was a strong political supporter of the City's mayor (the "Mayor") who called then-police chief Castillo, Guerra's direct superior, and urged that the charges be dropped. Castillo proceeded to call Guerra and urged Guerra to tell the officer to drop the charges. But Guerra, "[i]n support of his officer," refused and, in Guerra's words, "unwittingly stoked the maliciousness, vengefulness, and ire of Defendant Castillo who was furious at Plaintiff [Guerra] for making him appear 'worthless' in the eyes of [the] Mayor."

During the same period, a probationary patrol officer (the "Probationary Officer") was released for failure to meet her probationary goals and "accidentally forgot a pair of prescription rayban (reading) glasses in her patrol unit." The glasses were found by an officer who turned them over to former defendant Sergeant Xavier Martinez. Martinez did not place the glasses in the lost and found or the evidence room, but rather on his own desk, in the same area where Guerra's desk was located. As the complaint then describes:

After Martinez placed the reading eyeglasses on his own desk, Plaintiff Guerra saw the reading glasses on Defendant Martinez's desk, tried them on, and placed them on his own desk. For about the next month, with the knowledge of the other supervisory officer and Sergeants, Srgt. Martinez and Srgt. Guerra played "tug of war" with the reading eyeglasses, as each would playfully take the reading eyeglasses from the other's desk and place them on his own desk for use.

Soon after, Castillo enlisted an investigator and directed him "to 'find a way to get rid of'" Guerra. The investigator homed in on the glasses, but at least one officer told the investigator, "we really don't have anything" on Guerra for merely using the glasses. The investigator informed Castillo that the investigation "conclusively established that no crime had been committed" by Guerra, but Castillo allegedly responded, "I don't care. He can beat the charge, but he can't beat the ride. Get me enough to file a warrant!"

Castillo then enlisted an "Internal Affairs Officer" to conduct "an administrative investigation" regarding the glasses, and the Internal Affairs Officer attempted to enlist the assistance of the Probationary Officer, the former owner of the glasses, in filing criminal charges. The Probationary Officer initially expressed no interest, saying, "Throw the glasses away." However, "[a]fter a significant amount of cajoling and pressuring, [the Officer] agreed to provide a statement that she had not authorized anyone to use her glasses."

Subsequently, on October 19, 2018, the Internal Affairs Officer notified Guerra that "he was being investigated for 'property that was checked out from the evidence room' and allegedly 'appropriated by [Guerra] without cause or justification,'" months earlier. Castillo immediately placed Guerra on administrative leave and informed him he was

required to appear for an interview with the Internal Affairs Officer several days later. Guerra claims he voluntarily appeared, denied the charges, and explained the situation, but "his explanation was falling on deaf ears," so he requested "a full and open evidentiary hearing to get to the truth of the allegations." That hearing would never be provided.

Soon after, on October 24, Castillo "resorted to 'blackmail' against [Guerra] by expressly informing him that if he did not resign by 5:00 p.m. on that day, he was going to terminate him and file a criminal prosecution." This was despite the fact Castillo "actually [k]new that no probable cause existed." Guerra refused to resign.

On October 25, Castillo "officially suspended [Guerra], recommended his termination, and ordered him to surrender his weapon and badge," and an arrest warrant was issued against Guerra for Class B misdemeanor theft. Guerra's counsel arranged to voluntarily present Guerra for arraignment at an agreed time and hour on October 26, but when Castillo learned of the timing, he contacted "all of the local television and print media to be present at the arraignment," "parad[ing]" Guerra before the local media and "effectively destroying Plaintiff's future credibility and career as a law enforcement officer." Guerra immediately posted his bond.

On November 2, 2018, Guerra was officially terminated in a letter from former defendant Luciano Ozuna. Plaintiff's counsel requested an administrative hearing from Ozuna on November 7, "to discuss the false allegations against Plaintiff that had wrongfully resulted in his dismissal[,] but the hearing was never provided."

A few months later, the complaint claims, "Defendant Castillo was completely incensed and enraged" when he learned the district attorney was about to dismiss the theft charge against Guerra because the district attorney had found "no evidence of a theft having been committed." Castillo,

therefore, "instructed his investigator . . . to change and draw up some new statements and affidavits to obtain a new arrest warrant," this time pushing a "tampering with evidence" charge. In clarification of his complaint,[1] Guerra alleges that Castillo "intentionally instructed and directed his subordinates to file perjured 'Probable Cause Affidavits' with the Alamo Municipal Court for presentment to the district attorney's office despite his actual knowledge that critical sworn 'facts' were false and would lead to Plaintiff's wrongful arrest" (emphasis in original).

Guerra's counsel again arranged for Guerra to appear at a specific time when a judge was ready and able to set his bond. Guerra appeared on January 8, 2019. The media was again present because Castillo "had advised [them] that he would be having a press conference." Castillo then "stopped" his staff from taking Guerra to the courthouse because "Castillo decided he was going to make Plaintiff Guerra sit in a jail cell overnight." The complaint alleges Guerra's cell was cold, he was denied a blanket, and Guerra's counsel was not allowed to see him.

All charges against Guerra were dismissed on May 2, 2019, based on insufficient evidence.

Guerra timely filed suit under 42 U.S.C. § 1983 against Castillo, the City, and several other involved officers. Relevant here, Guerra's complaint asserts Fourth Amendment false arrest and malicious prosecution claims, along with a First Amendment retaliation claim, against Castillo. It also alleges the City is liable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), citing both Castillo and "the City

---

[1] The district court invited Guerra to clarify his complaint and answer several specific inquiries. No party objects to our treating this clarification as part of Guerra's complaint for purposes of 12(b)(6) and 12(c), as the district court did below.

Manager," Ozuna, as policymakers on whom the City's liability should be based.

The other officers filed a motion to dismiss under 12(b)(6), which the district court granted. Guerra does not challenge their dismissal on appeal.

The City also filed a motion to dismiss under 12(b)(6), which the district court granted. The district court found that Guerra had failed to point to any policymaker on whom the City's *Monell* liability might plausibly be based.

Later, Castillo moved to dismiss under 12(b)(6) and 12(c). The court denied Castillo's 12(b)(6) motion because he had already filed an answer to Guerra's complaint but granted Castillo's 12(c) motion based on qualified immunity. It found that Guerra's Fourth Amendment false arrest claim failed to overcome Castillo's qualified immunity due to an absence of clearly established law; his Fourth Amendment malicious prosecution claim is not cognizable under Fifth Circuit precedent; and Guerra's First Amendment retaliation claim fails because Guerra did not identify protected speech that caused Castillo's retaliatory acts.[2]

## II.

Guerra timely appeals the City's dismissal under 12(b)(6) and Castillo's dismissal under 12(c). We have jurisdiction under 28 U.S.C. § 1291.

We review a district court's grant of a 12(b)(6) motion to dismiss de novo. *Clyce v. Butler*, 876 F.3d 145, 148 (5th Cir. 2017). "To survive a motion to dismiss, a plaintiff must plead enough facts to state a claim to relief that is

---

[2] The district court also rejected Guerra's Eighth and Fourteenth Amendment claims against Castillo, which Guerra has abandoned on appeal.

plausible on its face." *Crane*, 50 F.4th at 461 (internal quotation marks and citation omitted). "When reviewing a motion to dismiss, we must accept all facts as pleaded and construe them in the light most favorable to the plaintiff." *Id.* (internal quotation marks and citation omitted). But "we do not accept as true legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement." *Anokwuru v. City of Hous.*, 990 F.3d 956, 962 (5th Cir. 2021) (cleaned up). "To survive a Rule 12(b)(6) motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 963 (internal quotation marks and citation omitted).

A 12(c) motion for judgment on the pleadings is also reviewed de novo, and the 12(c) standard "is the same as that applied to Rule 12(b)(6)." *Vardeman*, 55 F.4th at 1049. "To survive a Rule 12(c) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Laviage v. Fite*, 47 F.4th 402, 405 (2022) (internal quotation marks and citation omitted).

"The doctrine of qualified immunity protects public officials from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jennings v. Patton*, 644 F.3d 297, 300 (5th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

> We undertake a two-pronged analysis to determine whether a government official is entitled to qualified immunity, inquiring: (1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.

*Id.* (citing *Pearson*, 555 U.S. at 232). Courts "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236.

"[A] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Melton v. Phillips*, 875 F.3d 256, 265 (5th Cir. 2017) (en banc) (internal quotation marks and citation omitted). The Supreme Court has

> repeatedly told courts . . . not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations and citations omitted).

When confronted with a qualified-immunity defense at the pleadings stage, the plaintiff must plead "facts which, if proved, would defeat [the] claim of immunity." *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019) (quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018)). The pleading standards remain "the same when a motion to dismiss is based on qualified immunity. The crucial question is whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983[,] and would overcome their qualified immunity defense." *Terwilliger v. Reyna*, 4 F.4th 270, 279-80 (5th Cir. 2021) (internal quotations and citations omitted). At the motion to dismiss stage, "[i]t is the plaintiff's burden to demonstrate that qualified immunity is inappropriate." *Id.* at 280 (citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)).

No. 22-40196

## III.

*A. False Arrest*

We begin with Guerra's false arrest claim and whether the facts alleged overcome Castillo's qualified immunity defense.[3]

The Fourth Amendment right to be free from arrest without probable cause is clearly established. *Terwilliger*, 4 F.4th at 285. Guerra's argument that Castillo violated his Fourth Amendment right against false arrest is based on the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* liability "addresses the distinct issue of false information in a warrant application." *Melton*, 875 F.3d at 264. Clearly established law at the time of Castillo's actions laid out that under *Franks*, § 1983 allows claims "against an officer who deliberately or recklessly provides false, material information for use in an affidavit in support of a warrant." *Id.* at 262 (cleaned up). An officer is liable under *Franks* only if the officer "assisted in the preparation of, or otherwise presented or signed a warrant application." *Id.* at 263. If an officer does not present or sign the affidavit, liability attaches only if "he helped prepare the complaint by providing information for use in it." *Id.* at 264.

The court below thought Castillo's alleged actions were relevantly like the actions of Sheriff Dolph Bryan in *Hampton v. Oktibbeha County Sheriff Department*, 480 F.3d 358 (5th Cir. 2007). In that case, an officer went to a

---

[3] Guerra argues that the district court erred when it granted Castillo qualified immunity without first holding him to his burden of establishing that he was acting within the scope of his discretionary authority. But our review of the record indicates that Guerra forfeited this argument below by failing to raise it and by, instead, conceding that Guerra can defeat Castillo's claim to qualified immunity *only* by showing that Castillo acted objectively unreasonably and violated Guerra's clearly established constitutional right. Because Guerra forfeited his scope-of-discretionary-authority argument, we will not consider it now. *See Thomas v. Ameritas Life Ins. Corp.*, 34 F.4th 395, 402 (5th Cir. 2022).

school to arrest a student. *Id.* at 361. The school's director, Hampton, asked multiple times to see a warrant. *Id.* The officer was reluctant but eventually capitulated. *Id.* Before the officer left the premises with the arrested student, two additional officers arrived and told Hampton that the Sheriff Department did not permit school personnel to see an arrest warrant for a youth. *Id.* Apparently upset by what the officers perceived as Hampton's unwarranted obstruction, the officers returned to the Sheriff Department and "discussed the situation with Sheriff Dolph Bryan," who "instructed them to fill out an affidavit, obtain a warrant, and place Hampton under arrest." *Id.* The officers did just that and arrested Hampton, who was later acquitted by a court that used language suggesting the arrest and charge were dubious. *Id.* at 361-62.

Hampton brought a § 1983 suit alleging *Franks* liability against the officers and Sheriff Bryan. *Id.* at 362. The district court denied qualified immunity to the Sheriff. *Id.* This court then reversed, finding that Hampton had failed to allege that Bryan violated Hampton's constitutional rights because Hampton did not claim that Bryan himself prepared or presented the warrant. *Id.* at 365. Moreover, the court held, the Sheriff "cannot be held liable under § 1983 for the actions of subordinates on any theory of vicarious liability." *Id.* (citation omitted).

We disagree that Castillo's alleged actions are relevantly like Sheriff Bryan's.[4] Guerra's complaint presents Castillo as the sole moving force behind a deliberate, long-term conspiracy to create and file affidavits Castillo knew to be false, with the purpose of exploiting the criminal justice system to arrest, detain, and torment Guerra for crimes Castillo knew he did not commit. Castillo, moreover, ordered the sham investigations that served as

---

[4] The district court correctly noted that the facts alleged by Guerra imply that Castillo was more involved than the sheriff in *Hampton*.

the bases for the false affidavits and pushed the investigations forward despite knowing Guerra was innocent. Sheriff Bryan, in contrast, was a bit player in a story driven by subordinate officers who *themselves* desired revenge against Hampton, and whose *own* experiences served as the basis for the allegedly false affidavits in that case.[5]

Instead, we hold that *Terwilliger v. Reyna* controls here. 4 F.4th 270. In that case, 177 people were arrested using a form affidavit after a shooting had left 9 dead and at least 20 injured at a May 2015 gathering of motorcycle clubs. *Id*. at 277-78. After the state failed to convict anyone, 31 of the arrestees filed § 1983 lawsuits alleging, *inter alia*, *Franks* liability against multiple defendants, including District Attorney Reyna who had been central to the 2015 arrests. *Id*. at 279.

In a Rule 12 motion to dismiss, Reyna pled both absolute prosecutorial immunity and qualified immunity, but the district court denied the motion. *Id*. On appeal, this court agreed with the district court. Our court rejected Reyna's absolute immunity claims because Reyna had been "personally investigating the scene of the fracas and taking photographs," and therefore acting as an investigator. *Id*. at 281. We noted that plaintiffs "allege that Reyna was the driving force behind the mass arrests and told Asst. Chief [of Police] Lanning that 'all bikers wearing colors' should be arrested." *Id*. at 280. And our court also emphasized that plaintiffs "allege that Reyna was

---

[5] Even under Hampton's version of the events, the subordinate officers provided a judge with "false information *by stating* that Hampton 'obstructed or resisted by force, or violence, or threats, or in any other manner' the arrest of the youth." 480 F.3d at 364 (emphasis added). It is plausible the officers and Sheriff Bryan believed it true, however, that Hampton "obstructed . . . in any other manner" the youth's arrest. In contrast, treating Guerra's allegations as true, Castillo certainly knew Guerra had not stolen the glasses or taken them from the evidence room, and he knew the investigations were shams, but he pushed his subordinates to continue forward regardless.

continuously updated . . . as to the status of the investigation" and he "had access to video footage . . . that revealed many [of the] attendees, including many of those arrested, had no connection to the violence or parties involved in the violence." *Id.*

We then proceeded to our qualified immunity analysis and asked whether, treating the facts in plaintiffs' complaint as true, Reyna's actions fell within the ambit of *Franks* liability. We said,

> Reyna . . . neither signed nor swore to the affidavit. Thus, *Franks* liability can only attach if he provided material information for use in the affidavit. The Plaintiffs plead generally that Reyna, among others, "caused an affidavit against each plaintiff to be presented." Such conclusory language is insufficient standing alone. In more detail, the Plaintiffs plead that Reyna was provided with evidence both from the scene and interviews of attendees. But, acting contrary to the information provided to him, he stated that "all bikers wearing colors" should be arrested. Accordingly, and treating his function as that of an investigator [subject to qualified immunity, rather than a prosecutor who would be entitled to absolute immunity], Reyna generated the basic facts set out in the probable cause affidavit. Thus, the Plaintiffs allege that Reyna "knew the exact wording of the affidavit" and knew or recklessly disregarded the fact that, based on the exculpatory evidence he had learned, probable cause did not exist to arrest some individuals potentially fitting the warrant's criteria. These allegations are sufficient to tie him to potential *Franks* liability.

*Id.* at 284.

Notably, our analysis made no mention of any *particular* false information Reyna provided for use in the affidavits. Instead, we emphasized Reyna's causal role as the driving force behind the false affidavits and arrests, alongside the fact he was presented with evidence that at least some bikers

wearing colors should not be arrested, but, "acting contrary to the information provided to him," told his subordinates and colleagues that all bikers wearing colors should be arrested. "*Accordingly*," we said, "Reyna *generated* the basic facts set out in the probable cause affidavit." *Id.* (emphases added).

Our court then made clear that we were deciding both prongs of the qualified immunity analysis against Reyna. *Id.* at 285. Referring back to the analysis quoted above, we found that Reyna's alleged actions violated the "clearly established right to be free from arrest without a good faith showing of probable cause." *Id.* Importantly, this holding addresses the state of the law when Reyna acted in 2015.

Turning back to the case at bar, we hold that Castillo's alleged actions are relevantly like Reyna's for purposes of evaluating his potential *Franks* liability at the Rule 12 stage. Castillo was the "driving force" behind the conspiracy, and he was "continuously updated" as to the status of the investigations he had ordered, including the fact the investigations revealed no criminality or impropriety. *See id.* at 280. Castillo knew probable cause did not exist to arrest Guerra, but, acting contrary to that information, pushed subordinates to file false affidavits with the purpose of having Guerra fired, humiliated, and arrested without probable cause. *See id.* at 284. And importantly, because Reyna's actions violated clearly established law in 2015, *see id.* at 285, Castillo's actions violated clearly established law in 2018 and 2019.

To the extent our analysis of Reyna's alleged actions applies imperfectly to Castillo's, that is because Castillo's alleged actions are more outrageous. We note, in particular, that Reyna faced a responsibility to seek justice in the immediate aftermath of enormous tragedy and wrongdoing. Castillo, in contrast, acted on a personal vendetta, and he exploited the

criminal justice system to exact revenge. Moreover, while Reyna overzealously pursued arrests despite knowing that probable cause did not exist for *all* the arrests, Castillo had only one target, Guerra, whom Castillo knew was innocent.

In sum, because Reyna "generated" the basic facts in the probable cause affidavits, such that the district court was correct to deny his Rule 12 motion based on potential *Franks* liability, *see id.* at 284, it follows *a fortiori* that Castillo "generated" the basic facts in the probable cause affidavits and the district court erred by granting his Rule 12 motion. Therefore, we REVERSE the district court's dismissal of Guerra's false arrest claim against Castillo and REMAND for further proceedings. "We do not opine further on whether [Guerra] may ultimately adduce evidence . . . sufficient to prove [his] case." *See id.* at 285.

*B. Malicious Prosecution*

Separately, Guerra argues that Castillo is liable under § 1983 based on a Fourth Amendment "malicious prosecution" theory. The district court rejected this argument on the ground that there "is no Fourth Amendment claim for malicious prosecution." *See Morgan v. Chapman*, 969 F.3d 238, 245 (5th Cir. 2020) (The Fifth Circuit "used to recognize . . . [a] *constitutional* right to be free from malicious prosecution. Today, it does not." (citation omitted)); *id.* (explaining that "an *en banc* majority of this court extinguished the constitutional malicious-prosecution theory" in *Castellano v. Fragoza*, 352 F.3d 939, 954 (5th Cir. 2003) (en banc)); *Anokwuru v. City of Hous.*, 990 F.3d 956, 964 (5th Cir. 2021) ("There is no freestanding right under the Constitution to be free from malicious prosecution.").

Guerra argues that the district court erred in light of *Thompson v. Clark*, 142 S. Ct. 1332 (2022), which presupposes the possibility of a Fourth Amendment claim for malicious prosecution. *Id.* at 1341 ("[A] Fourth

Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence."); *see Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023) ("[*Thompson*] overrul[ed] our precedent in *Castellano*.").[6]

But Fifth Circuit case law between 2003 (*Castellano*) and 2021 (*Anokwuru*) explicitly denied the possibility of a constitutional malicious prosecution claim. When evaluating whether Castillo violated clearly established law for purposes of our qualified immunity analysis, we consider whether the law was clearly established "at the time of the defendant's alleged misconduct." *Jennings*, 644 F.3d at 300 (citing *Pearson*, 555 U.S. at 232). We AFFIRM the district court's Rule 12 dismissal of Guerra's malicious prosecution claim against Castillo because this court's caselaw explicitly disclaimed the existence of a constitutional claim for malicious prosecution at the time of Castillo's alleged conduct in 2018 and 2019 and Guerra has identified no Supreme Court case law from the same period acknowledging such a claim.

## IV.

Guerra also raises a First Amendment retaliation claim against Castillo on the theory that Castillo retaliated against Guerra for protected political speech.

The district court found that Guerra failed to allege sufficient facts to support this theory, which would require that Guerra engaged in First Amendment protected speech and that the protected speech motivated Castillo's retaliatory acts. *See Izen v. Catalina*, 398 F.3d 363, 367 (5th Cir.

---

[6] *Thompson* was published on April 4, 2022, *see* 142 S. Ct. 1332, less than a month after the district court rejected Guerra's malicious prosecution theory on March 8, 2022.

No. 22-40196

2005); *Sims v. City of Madisonville*, 894 F.3d 632, 640-41 (5th Cir. 2018). We agree with the district court.

Guerra plausibly alleges that his refusal to direct his subordinate to drop the DWI charges, despite Castillo's urging, was a but-for cause and substantial motivation for Castillo's retaliatory acts. But Guerra has failed to put forward any law that suggests Guerra's refusal to do as his direct superior asked, in the context of his employment as a patrol sergeant, constitutes First Amendment protected speech, let alone that it is First Amendment protected speech under clearly established law. *See Garcetti v. Ceballos*, 547 U.S. 410, 418-19, 424 (2006).

Given that this is a qualified immunity context, "[i]t is the plaintiff's burden to demonstrate that qualified immunity is inappropriate," even at the motion to dismiss stage. *Terwilliger*, 4 F.4th at 280. We conclude that Guerra has failed to overcome Castillo's qualified immunity because he has put forward no authority relevant to the question whether his refusal was protected speech.[7]

We AFFIRM the district court's dismissal of Guerra's First Amendment claim against Castillo.

---

[7] Separately, Guerra's briefing sometimes suggests that Castillo retaliated against Guerra due to Guerra's *political associations*. But we agree with the district court that this does not accurately reflect his complaint, which does not plead facts sufficient to plausibly infer that Castillo retaliated against Guerra for his political associations. The complaint does not suggest, for example, that Castillo retaliated because Guerra failed to support the Mayor politically, or because Guerra supported the Mayor's rival. Guerra's complaint is clear: Castillo retaliated against him for refusing to do as Castillo asked and making him appear feckless before the Mayor. Even treating the complaint's claims as true and construing them in Guerra's favor, the complaint does not plausibly allege that Guerra's *political associations* were a but-for cause and motivation for Castillo's actions.

## V.

Finally, Guerra raises a § 1983 claim against the City under *Monell*, 436 U.S. 658. "[M]unicipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citation omitted). To be a policymaker, "neither complete discretionary authority nor the unreviewability of such authority" is enough; "[t]here must be more." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010).

Guerra's complaint alleges that both Castillo and the City Manager, Ozuna, were policymakers. We begin with Castillo.

Guerra's complaint states that the City "permit[ed] its Chief of Police unrestricted control of the police Department. . . . This abdication of authority as expressly set forth in their city charter and as customarily[] practiced by the city and its agents, has resulted in a consistent abuse of due process to aggrieved individuals such as plaintiff and a deprivation of his right to due process under the 4th Amendment . . . and under the Monell [s]tandards set forth by the U.S. Supreme Court." No citation is made to a particular part of the city charter.

In its motion to dismiss below, the City produced parts of the city charter to argue that "all powers of the City of Alamo [are] vested in [its] Board of Commissioners" and that neither the Chief of Police nor the City Manager has policymaking authority. It also argued, in further briefing, that Guerra failed to "identify any facts to establish the City ever delegated policymaking authority to Castillo."

In reply, Guerra reproduced the same parts of the city charter, bolding the phrase "[The Board] may pass any ordinances they may desire delegating any part of their authority and duties to any other person, offices or

employee, not inconsistent with the Constitution or laws of the State of Texas." Art. III § 6. But he mentioned no ordinance that delegated that authority. Instead, he reproduced a section of the city charter stating, "[t]he chief of police shall be the chief administrative officer of the department of police," and "[t]he chief of police shall be responsible for the administration of the police department." Art. IV § 2.

The above does not allow this court to plausibly infer that Castillo had "more" than either "complete discretionary authority []or the unreviewability of such authority," as *Zarnow* requires. 614 F.3d at 168.

Next, Guerra argues that Ozuna, the City Manager, had policymaking authority under *Monell*.[8] Guerra's complaint noted that he was terminated in a letter from Ozuna. The complaint also claims that Guerra's counsel had requested an administrative hearing from Ozuna "to discuss the false allegations against Plaintiff that had wrongfully resulted in his dismissal[,] but the hearing was never provided."

Once again, Guerra's complaint does not identify facts that allow this court to plausibly infer that Ozuna had both complete or unreviewable discretionary authority and also "more." *See id.* Therefore, we AFFIRM the district court's dismissal of the City under 12(b)(6).

## VI.

We REVERSE the district court's dismissal of Guerra's Fourth Amendment false arrest claim against Castillo and REMAND for further

---

[8] The district court did not consider this argument because Guerra's complaint fails to identify Ozuna *as* the City Manager, leaving it entirely obscure who the "City Manager" might be and what actions he might have taken. We will consider the argument because Guerra was dismissed under Rule 12(c) and Guerra's response brief to Castillo's motion to dismiss identifies Ozuna as the City Manager.

No. 22-40196

proceedings. We AFFIRM the district court's judgments in all other respects.