# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 3, 2024

Lyle W. Cayce

Clerk

No. 22-20621

Austin Thompson Hughes,

*Plaintiff—Appellee*,

*versus*

Michael Garcia; Joshua Few,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-1994

Before Jolly, Engelhardt, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

For those who worry that qualified immunity can be invoked under absurd circumstances: Buckle up.

Austin Thompson Hughes is a Good Samaritan. After 2:30 a.m., Hughes called 911 to report a pickup truck swerving violently across a four-lane highway in Houston. While Hughes was on the phone with emergency dispatchers, the drunk driver crashed. Still on the phone with 911, Hughes pulled behind the drunk driver and effectuated a citizen's arrest in accordance with Texas law. But when police officers arrived at the scene,

they *let the drunk driver go and then arrested Good Samaritan Hughes.* (Seriously.) Piling insanity on irrationality, the officers then charged Hughes with a felony for impersonating a peace officer. Hughes spent thousands of dollars defending against the frivolous criminal charges before the City of Houston dropped them. Then Hughes brought this § 1983 suit against the two officers who victimized him. The district court denied qualified immunity. We affirm. (Obviously.)

I.

A.

This case arises from a motion to dismiss. So we take the following well-pleaded facts as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

On March 23, 2019, at approximately 2:37 a.m., Austin Thompson Hughes, a former police officer, was driving for Uber. While driving, he saw a white GMC Sierra pickup truck swerving erratically on Interstate 610 in Houston. Suspecting the truck's driver was intoxicated, Hughes dialed 911 and followed the Sierra with his Jeep's flashers on. During the call, Hughes described the Sierra and his own vehicle and reported the truck swerving at high speed, hitting the concrete barriers on both sides of the highway, and finally coming to a stop. Hughes's two Uber passengers can be heard on the recording confirming Hughes's observations. Hughes stopped behind the Sierra. At some point during this episode, Hughes's 911 call was transferred to a Houston Medical 911 call-taker.

Hughes continued his report to the second 911 call-taker. He told the call-taker "I need to get [the driver] out of the car because, I mean, they're going to kill somebody." ROA.258. Hughes then exited his vehicle, observed that the driver was "obviously intoxicated," and retrieved the driver's keys, license (which was sitting in the Sierra's center cupholder), and bottles of alcohol. A third-party caller corroborated many of these details to another 911

operator, including Hughes "trying to get [the drunk driver] out of the car." ROA.262.

When Hughes returned to his Jeep, still on the phone with 911, he saw the intoxicated driver exit the Sierra and "attempt to flee towards the center of the interstate on foot." ROA.249. Hughes yelled at the driver to get back in his truck in an attempt to prevent him from being hit by oncoming traffic. The 911 operator then disconnected the call, assuring Hughes emergency units were on their way.

The drunk man continued to move into oncoming traffic on foot. Hughes "felt that the best and safest option would be to physically restrain the suspect," so he "retrieved handcuffs from his Jeep and used them to temporarily detain the DWI Suspect." ROA.260. At no point did Hughes identify himself as a police officer. Finally, Hughes suggested his two Uber passengers request a new ride, which they did.

When HPD Officers Michael Garcia and Joshua Few arrived on the scene (roughly 17 minutes after Hughes's initial 911 call), they re-handcuffed the drunk driver and asked Hughes to meet them at a nearby gas station so they could take his statement. At the gas station, Officer Garcia interviewed the drunk driver while Officer Few interviewed Hughes. Hughes recounted his observations of the pickup truck's erratic movements, the driver's multiple collisions with the median and concrete barrier, and his assessment of the driver's intoxication. Hughes also told Few "he used to be a police officer." ROA.264. When Garcia finished taking the drunk driver's statement, he asked Hughes for his Uber passengers' contact information. Hughes explained that Uber's privacy policies prevented him from accessing that information. But he showed Garcia his Uber app, including the details of his most recent trip. Later, at Garcia's request, Hughes emailed Garcia

screenshots of his Uber trip details. Inexplicably, the officers did not arrest the drunk driver.

Few and Garcia then prepared an incident report. According to Hughes's complaint, the report recounted the drunk driver's statement to Garcia at the scene:

> On 3-23-2019 I was at a *flea market* with *Jesse* and his friends (Uber drivers [*sic*] alias). Jesse said that we could go back to his place and that he lived on 59 south near downtown. I told Jesse that I lived on I10 and he said that he would take me home later. I said okay because I had been drinking on night [*sic*] and had *more than 7 beers. I was too drunk to drive* but I had a friend *at the bar* that could of [*sic*] taken me home. Jesse said let's go to his house and he offered to drive so we went. Mid way [*sic*] during the trip I was not familiar with where I was at. I started to ask Jesse where he was taking me. I finally asked Jesse to just take me home and[ ]that is when he got mad. *Jesse asked if I had something going on with his wife.* I told Jesse no. Jesse then asked me what I got going on with his wife. I was confused and asked what he meant. Jesse said he knows there is something going on. *Jesse stopped my truck on the freeway* and got out of it. He came to my passenger side door and was trying to get me out of the car. I was confused at this point and only wanted to know what was going on. Jesse kept telling me I am fucked and how I was going to be deported. I was on the freeway so I could not just get away from Jesse. Finally Jesse told me to turn around and put my hands behind my back. When I did not do it fast enough Jesse kneed my legs to force me to comply. I asked Jesse why he was doing this and who gave him the right to do this. Jesse told me he was a police officer. Jesse then put me in handcuffs. My leg was hurting making it hard for me to stand and I had scratches on my wrists from him trying to handcuff me.

ROA.265–66 (emphases added). The report credited the drunk driver's version of events—despite the obvious fact that Hughes's name is not "Jesse"; Hughes and the drunk driver had never met; there is no evidence that Hughes accused the stranger of fooling around with Hughes's wife; Hughes never drove the drunk driver anywhere; multiple independent witnesses and 911 callers (including Hughes's own, recorded 911 call) and the Uber app screenshots confirm Hughes was not driving the white GMC Sierra; and there is no evidence of a flea market open in Houston at 2:00 a.m., much less a flea market that doubles as a bar where the drunk driver could drink more than 7 beers. But the report did indicate that Garcia conducted a field sobriety test on the drunk driver and that Garcia "got 6/6 clues" suggesting intoxication under the horizontal gaze nystagmus ("HGN") test. ROA.269.

As to Hughes's statement, Few reported Hughes told him about his Uber passengers, his decision to stop the drunk driver, and explained he had handcuffs in his Jeep because "he was a police officer . . . *at one time*." ROA.265 (emphasis in original). The report also included some details from the Uber screenshots Hughes provided. But the report misinterpreted the scheduled destination shown in the screenshots as Hughes's *actual* stopping point, ignoring the fact Hughes had obviously stopped on the freeway before reaching that destination.

Despite the inconsistencies in the drunk driver's story, the Sierra driver's obvious intoxication, and the corroborating evidence for Hughes's statement, the report did not address the incident as a DWI investigation. Instead, it addressed an offense for "Impersonating an Officer" and identified Hughes as the suspect. The report thus credited the drunk driver's statement that Hughes "told [the drunk driver] he was a police officer." Officer Few submitted the report.

5

B.

Two days later, Garcia signed a probable cause affidavit based on that incident report. The affidavit asserted Hughes "unlawfully, intentionally impersonate[d] a public servant, namely a peace officer with intent to induce [the drunk driver] to submit to his pretended official authority and to rely on his pretended official acts, by stating he was a Police Officer." ROA.273–74 (first alteration in original). The affidavit included information gathered by both Garcia and Few during the investigation.

The affidavit again recounted several details allegedly from Hughes's 911 call. But the affidavit omitted critical information, like Hughes's play-by-play of the Sierra swerving erratically down the highway, his description of his own vehicle, and Hughes yelling at the drunk driver to get back in the car. Instead, the affidavit claims Hughes can be heard on the 911 call asking the drunk driver for his identification. According to Hughes, he never made that request—the drunk driver's license was in the cupholder of the Sierra, so Hughes simply retrieved it.

The affidavit then provided a different version of the drunk driver's statement than the incident report offered. According to Hughes's complaint, the affidavit said:

> [The drunk driver] told me that *while he was being detained and handcuffed by Mr. Hughes, he asked Mr. Hughes if he was a police officer and Mr. Hughes replied, 'Yes, I am a police officer.'* [The drunk driver] stated that when he refused to turn around, Mr. Hughes struck him multiple times with knees to his legs. [The drunk driver] stated that he had been drinking at a flea market on Airline Dr. and met Mr. Hughes and his *two female* friends there. [The drunk driver] stated that they talked most of the night and Mr. Hughes invited [the drunk driver] to his house to have some drinks. [The drunk driver] stated that Mr. Hughes offered to drive his white pickup truck and [the drunk

driver] agreed since he had been drinking. [The drunk driver] stated that Mr. Hughes told him he lived on the 59 freeway going to downtown. Mr. Hughes and [the drunk driver] headed out and *two females drove Mr. Hughes's jeep.* [The drunk driver] stated that mid trip he became uncomfortable with the situation and asked to be taken home. [The drunk driver] stated that an argument began and Mr. Hughes got upset and pulled the vehicle over on the freeway. [The drunk driver] stated that Mr. Hughes got out and began ordering him out of the vehicle. [The drunk driver] stated he was forced out of the vehicle and then handcuffed. [The drunk driver] stated that he was hit several times in the leg during this process by Mr. Hughes. [The drunk driver] stated the [sic] he felt pain and wanted to pursue charges.

ROA.277 (emphasis in original complaint). The new details—like the previously undiscussed "two female friends" who purportedly drove Hughes's Jeep to the scene on Interstate 610—appeared nowhere in the incident report and contradicted Hughes's statement. Moreover, Garcia reported that an "Officer A. Walters" assisted in interviewing Hughes. But there is no other evidence "Officer A. Walters" had any involvement in this case at any time.

The new version of the statement also omitted key facts suggesting the drunk driver's unreliability. For example, the affidavit made no mention of the drunk driver calling Hughes "Jesse" or the apparent confusion about whether the drunk driver was drinking at a "flea market" or a bar. *Compare* ROA.265–66, *with* ROA.277. And perhaps most tellingly, the probable cause affidavit omitted that the officers' sole basis for believing Hughes committed a felony—the drunk driver's statement—came from the ramblings of a man who flunked all six clues in the HGN intoxication test.

Finally, as to Hughes's statement, the affidavit omitted any corroborating evidence supporting Hughes's account of the incident. For

example, the affidavit omitted the third-party 911 call and the screenshots from Hughes's Uber app. Instead, the affidavit reported Hughes "would not" disclose his passengers' contact information.

Despite these misstatements, omissions, and inconsistencies, Garcia submitted the probable cause affidavit to the District Attorney's office. The DA charged Hughes with felony impersonation of a public servant, and the 262nd Criminal District Court of Harris County issued a warrant for Hughes's arrest.

At about 3:00 a.m. on March 25, Officers Few and Garcia went to Hughes's home to arrest him. The record does not reveal, and judicial imagination cannot fathom, why officers needed or wanted to execute this arrest warrant at 3:00 a.m. But Hughes, who was asleep with his wife at the time, answered the officers through the door. Few and Garcia asked to see Hughes's Uber app, insisting they needed to see his actual cell phone, rather than the screenshots he had already sent. Hughes "cracked open the door to give [his cell phone] to the officers. However, instead of taking the phone, [the] officers grabbed Mr. Hughes's outstretched arm and pulled him out of his apartment into the hallway and handcuffed him." ROA.280. The record does not reveal, and again judicial imagination cannot fathom, why officers needed to trick an undressed Hughes into extending his arm through the cracked door so he could be forcibly arrested in his pajamas. Few and Garcia allowed Hughes's wife to clothe him before taking him to the Harris County Joint Processing Center. Hughes was placed in the jail's general population for over 24 hours before being released on March 26.

Hughes was charged with third-degree felony impersonation of a peace officer under Texas Penal Code § 37.11. The charge carried a minimum sentence of 2 years in prison, a maximum of 10 years in prison, and a possible

fine up to $10,000. *See* Tex. Penal Code § 37.11(b); Tex. Penal Code § 12.34. Hughes hired a defense attorney.

Almost three months later, on June 17, 2019, "the State of Texas requested that the criminal action against Mr. Hughes be dismissed on the basis that 'no probable cause existed . . . to believe the defendant committed the crime.'" ROA.282 (alterations adopted). The county judge dismissed the case the same day.

## C.

Hughes sued various officials, the City of Houston, and Harris County under 42 U.S.C. § 1983. As relevant to this interlocutory appeal, Hughes alleged Few and Garcia violated his Fourth and Fourteenth Amendment rights to be free from unlawful arrest and malicious prosecution by filing a false report or by knowingly standing by while the other officer did so. Few and Garcia moved to dismiss Hughes's complaint, asserting qualified immunity. The district court denied both officers' motions. Few and Garcia timely appealed.

## II.

When a district court denies qualified immunity on a motion to dismiss, "we may immediately review the denial." *Ramirez v. Escajeda*, 921 F.3d 497, 499 (5th Cir. 2019) (citing *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019)). But because the denial of a motion to dismiss is not a final order of the district court, "we have jurisdiction only to decide whether the district court erred in concluding as a matter of law that officials are not entitled to [qualified immunity] on a given set of facts." *Ibid.*

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Government officials are entitled to immunity from § 1983 suits for damages

arising from their duties unless the plaintiff can show "(1) that the officer 'violated a federal statutory or constitutional right' and (2) that 'the unlawfulness of the[] conduct was clearly established at the time.'" *Ramirez*, 921 F.3d at 500 (internal quotation marks omitted) (quoting *District of Columbia v. Wesby*, 538 U.S. 48, 62–63 (2018)). The officers' basic contention is that, even if they violated Hughes's constitutional rights, they are nonetheless shielded from liability by the fact that an independent intermediary (namely the magistrate who approved their application for an arrest warrant) blessed their unconstitutional conduct. *See Franks v. Delaware*, 438 U.S. 154, 166–67 (1978) (discussing similar argument). Our review is *de novo. See Guerra v. Castillo*, 82 F.4th 278, 284 (5th Cir. 2023).

We first (A) explain the independent intermediary doctrine and the *Franks* exception to it. Then we (B) apply that doctrine to Few and Garcia's reckless or intentional misstatements and omissions in the warrant documents. Finally we (C) explain that the warrant affidavit could not have established probable cause without the offending misstatements and omissions.

## A.

Hughes claims Officers Few and Garcia violated his Fourth Amendment rights by arresting and prosecuting him without probable cause because they included material misstatements and omissions in their warrant affidavit and materials. If established, such misstatements constitute a clearly established Fourth Amendment violation under *Franks v. Delaware*.

As a baseline, "[t]he constitutional claim of false arrest requires a showing of no probable cause." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (citing *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001)). Similarly, "the gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause."

*Thompson v. Clark*, 596 U.S. 36, 43 (2022). Probable cause in turn requires "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Winfrey v. Rogers*, 901 F.3d 483, 495 (5th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). Both violations therefore turn on whether a reasonable officer would believe the suspect had committed a crime. *See Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) ("[C]ourts must look to the totality of the circumstances and decide whether these historical facts, *viewed from the standpoint of an objectively reasonable police officer*[,] demonstrate a probability or substantial chance of criminal activity." (emphasis added) (quotations omitted)).

The independent intermediary doctrine ensures that officers can make reasonable probable cause mistakes: "A warrant secured from a judicial officer typically insulates law enforcement personnel who rely on it" from liability for unlawful arrest, even in the absence of probable cause. *Villarreal v. City of Laredo*, 94 F.4th 374, 393 (5th Cir. 2024) (en banc). The shield applies because "'if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation' for the Fourth Amendment violation." *Jennings v. Patton*, 644 F.3d 297, 300–01 (5th Cir. 2011) (quoting *Cuadra v. Houston ISD*, 626 F.3d 808, 813 (5th Cir. 2010)).

But the independent intermediary doctrine has an important exception. If "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," a neutral magistrate's signature will not protect the offending officers. *Villarreal*, 94 F.4th at 393 (emphasis omitted) (quotation omitted). And under *Franks v. Delaware*, it is equally obvious that no reasonably competent officer would lie or make material omissions in a warrant application. *See Terwilliger*, 4 F.4th at 281 ("Functionally, the holding of *Franks* is an exception to the independent intermediary doctrine."). *Franks* holds that an officer cannot avoid liability

where a warrant affidavit (1) contains false statements or material omissions (2) made with at least "reckless disregard for the truth" that (3) were "necessary to the finding of probable cause." 438 U.S. at 155–56; *see also Winfrey*, 901 F.3d at 494 (same). An officer's decision to submit an affidavit barred by *Franks* violates the Fourth Amendment because:

> The requirement that a warrant not issue "but upon probable cause, supported by Oath or affirmation," would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile.

*Franks*, 438 U.S. at 168 (quoting U.S. Const. amend. IV). So if a plaintiff makes the tripartite *Franks* showing, then any arrest or prosecution lacked probable cause, the defendant officers are not entitled to the protection of the independent intermediary doctrine, and the misstatements or omissions suffice to establish a Fourth Amendment violation. *See Terwilliger*, 4 F.4th at 281–82.

Two additional wrinkles to the *Franks* doctrine bear emphasis. First, *Franks* liability is not limited to the person who prepared or signed the warrant affidavit. Instead, liability can attach to (A) any person directing the inclusion of false information in the affidavit, *see Guerra*, 82 F.4th at 288, or (B) any person who supplied false information for the purpose of compiling a warrant affidavit, *see Melton v. Phillips*, 875 F.3d 256, 262 (5th Cir. 2017) (en banc). So as long as an officer prepared information for the *purpose* of inclusion in a warrant affidavit, he can be liable without preparing the affidavit. *See Laviage v. Fite*, 47 F.4th 402, 406 (5th Cir. 2022) (citing *Franks*, 438 U.S. at 171) ("[T]he Supreme Court held an officer violates the Fourth Amendment if he deliberately or recklessly provides false information necessary to secure an arrest warrant.").

No. 22-20621

Second, *Franks* requires courts to conduct a "corrected affidavit" analysis. *Terwilliger*, 4 F.4th at 283 (quoting *Winfrey*, 901 F.3d at 495). Courts must consider whether the warrant affidavit would support probable cause if the misstatements and material omissions were eliminated. *See Winfrey*, 901 F.3d at 495. At the motion to dismiss stage, plaintiffs need only "point out specifically the portion of the warrant affidavit that is claimed to be false . . . accompanied by a statement of supporting reasons." *Terwilliger*, 4 F.4th at 283 (quoting *Franks*, 438 U.S. at 171). By pleading such facts, "[p]laintiffs [meet] their burden of alleging a *Franks* violation sufficient to withstand the test of *Iqbal/Twombly*, [but] if they press [the] litigation, they must offer tangible proof to overcome the 'presumption of validity with respect to the affidavit supporting the warrant.'" *Ibid.* (quoting *Franks*, 438 U.S. at 171 (alteration adopted)). Thus, specific examples of misstatements and omissions—combined with inferential explanation as to their materiality—can carry a complaint across the Rule 12(b)(6) line.

In sum, an officer who recklessly or intentionally contributed misleading statements or omissions to a warrant affidavit violates the arrestee's constitutional rights. That violation has been clearly established since *Franks*. *See Winfrey*, 901 F.3d at 494.[1]

_____

[1] In the context of split-second excessive force cases, the Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). That is so because in the typical excessive-force case, officers must make life-or-death split-second decisions, often at night or in the chaos of a deadly chase or both. *See, e.g.*, *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) ("That means the law must be so clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately."). This case does not involve excessive force, or split-second decisions, or the chaos of a chase. Rather, it involves a simple, clearly established rule that all officers should know at all times under *Franks* and *Winfrey*: Do not lie.

B.

We next apply the *Franks* doctrine to this case. The officers' probable-cause case hinges on the drunk driver's allegation that Hughes said, in effect, "I am a police officer." So we consider each officer's efforts to convince the magistrate that Hughes in fact said that.

1.

First, Officer Few. Hughes alleged Few contributed false statements to the incident report, knowing that report would be used in the warrant affidavit. Hughes also alleged Few knew Officer Garcia had omitted critical information in the two documents and failed to correct them. Under either theory, Hughes presented enough facts to support a Fourth Amendment claim against Few.

First and foremost, Hughes pleaded a direct *Franks* violation based on Few's contributions to the incident report. As discussed above, Few may be liable for a *Franks* violation if he produced information containing false statements or material omissions made with at least "reckless disregard for the truth," *Winfrey*, 901 F.3d at 494 (quoting *Franks*, 438 U.S. at 155), and he knew that information would be used in a warrant affidavit, *see Melton*, 875 F.3d at 262.

Here, Few submitted the incident report entitled "Impersonating an Officer." That report *omitted* critical pieces of information from Hughes's statement while *including* statements from the drunk driver that the officers' own lawyer called "crazy." Oral Arg. at 8:01–17. For example, Hughes alleges he told Few about the drunk driver's erratic driving, that the driver's truck had hit the median before coming to a stop on the side of the interstate, and that the drunk driver repeatedly tried to "walk onto the interstate in the way of oncoming traffic." ROA.263–64. But according to the complaint, the incident report noted only that Hughes told his Uber passengers to get a new

ride, detained the drunk driver, and had handcuffs because "he was a police officer . . . *at one time*." ROA.265 (emphasis in original).

Meanwhile, the incident report relayed an entire narrative from Officer Garcia's conversation with the drunk driver. But that narrative was "crazy." (Again, the Houston Assistant City Attorney's word.) Among other things, the drunk driver referred to Hughes as "Jesse," suggested the drunk driver and "Jesse" were drinking at a flea market or a bar at 2:00 a.m., implied Hughes and the drunk driver had a prior relationship, and said Hughes was driving the white Sierra. ROA.265–66. But Hughes's name is not Jesse; no flea markets in Houston are open and serving beer at 2:00 a.m.; Hughes did not know the drunk driver; and Hughes's black Jeep was also at the scene when the officers arrived. The incident report noted none of these obvious, "crazy" inconsistencies.

Few had access to ample evidence suggesting both that Hughes's statement was reliable and that the drunk driver's was not. For example, Hughes sent the officers screenshots of his last Uber trip, corroborating his story. But the report misstated the information in the screenshots, suggesting the displayed endpoint of the ride should have matched Hughes's actual stopping point, when in reality it reflected only the requested destination. Moreover, Few presumably had access to Hughes's recorded 911 calls, with the play-by-play description of the white Sierra's actions and the Uber passengers' voices. Again, Few omitted any such discussion. Finally and most importantly, the inconsistencies or falsehoods in the drunk driver's story should have decreased or eliminated its relative weight. But Few's report contained none of these facts. That evinces at a bare minimum that Few recklessly disregarded the truth.

And there can be little doubt Few submitted the incident report "for the purpose of its being included in [the] warrant application." *Melton*, 875

F.3d at 262. Few's deep involvement with the case raises a plausible inference that he knew the incident report would be used to prosecute Hughes. Few conducted Hughes's interview. He submitted the incident report labeled "Impersonating an Officer," indicating the focus of the investigation had already shifted to Hughes. He went with Garcia two days later and arrested Hughes. That Few completed the incident report while Garcia completed the warrant affidavit does not absolve Few of liability given these strong indications that he knew exactly what purpose the incident report would serve. *See Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814 (5th Cir. Nov. 27, 2023) (per curiam) (unpublished) (denying qualified immunity as to both officers where one initially investigated and the other prepared the warrant affidavit). Hughes's allegations suffice to raise a plausible inference that Few knew his reckless omissions and misstatements would be used in the warrant affidavit, "and that is all he must show." *Id.* at *5.

Second, Hughes established a plausible claim against Few as a bystander. Bystander liability attaches when an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).

Here, Few allegedly knew the information Garcia contributed to the incident report (and then to the warrant affidavit) contained material misstatements and omissions that did not accurately reflect the evidence from their investigation. Few had access to substantial evidence contradicting the drunk driver's narrative and Garcia's recitation of the facts. Even if Few himself did not *write* the false statements, he submitted the report containing them. That raises a reasonable inference that he knew of the harm about to be perpetrated but submitted the report anyway. That is enough for bystander liability at this stage.

2.

Second, Officer Garcia. Hughes alleged the standard *Franks* claim against Garcia. Therefore, Garcia may be liable if he knowingly, or with reckless disregard for the truth, included false statements or material omissions in the warrant affidavit. *See Franks*, 438 U.S. at 155–56.

In addition to his incident report contributions, Garcia prepared and submitted the warrant affidavit that directly led to Hughes's arrest. That affidavit contained numerous false statements and material omissions. Most importantly, Garcia materially altered the drunk driver's statement from the incident report. The version of the drunk driver's statement in the warrant affidavit patched many of the obvious holes in the incident report. For example, it omitted any reference to "Jesse." It also resolved the inconsistency as to whether the drunk driver was at a flea market or a bar, only mentioning a flea market (though it again did not address which flea markets in Houston were open and serving beer at 2:00 a.m.). And the new version of the story explained that Hughes's Jeep arrived at the side of the highway because "two female friends drove [the] jeep." ROA.277. By altering these details, Garcia's affidavit manufactured a more credible narrative.

Garcia's affidavit also omitted external evidence undermining the drunk driver's credibility or supporting Hughes's. For example, the affidavit failed to mention the HGN test or that Garcia "got 6/6 clues" indicating intoxication. It excluded reference to the Uber receipts showing Hughes picked up his passengers at approximately 2:30 a.m. and so could not have been out drinking with the drunk driver at a flea market. Then, despite admitting that he listened to the recording of Hughes's 911 call, Garcia omitted the stated purpose of the call, Hughes's description of his Jeep and the Sierra, Hughes's real-time descriptions of the drunk driver's actions,

Hughes's explanation for restraining the driver, and his repeated exclamations to the driver to "stay" and "get back in the car." ROA.275. Finally, Garcia did not mention the third-party 911 call that corroborated Hughes's statement.

The affidavit also added false details, beyond those in the drunk driver's narrative. Most significantly, Garcia's affidavit claimed an "Officer A. Walters" was also at the scene. According to Garcia, "Walters" reported that Hughes "handed documents to [Walters] that he said he retrieved from [the drunk driver's] vehicle." ROA.276. But Officer Walters's name appears nowhere else in the record, including the incident report, and Hughes's statement made no mention of any officer other than Few and Garcia arriving at the scene. At oral argument, counsel for the officers was unable to offer any information or justification for "Officer A. Walters" suddenly appearing in Garcia's report.

All told, Garcia's affidavit made at least eight material misstatements or omissions. Any reasonable officer would have known, based on the evidence available, that the affidavit contained these errors. *See Terwilliger*, 4 F.4th at 284 (holding *Franks* liability attaches to a defendant who acts "contrary to the information provided to him"). Hughes therefore sufficiently pleaded Garcia violated his clearly established Fourth Amendment rights by producing and submitting the affidavit.

## C.

Finally, the "corrected affidavit" analysis. Officers are liable for their false statements only if those statements were "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. We consider whether probable cause existed to arrest Hughes for the felony of impersonating an officer even without the erroneous statements and omissions in the affidavit. *See Terwilliger*, 4 F.4th at 283.

The answer is easily "no." Once the officers' misstatements and omissions are corrected, there is no basis to find probable cause that Hughes committed a felony. To the contrary, in the absence of the officers' misstatements and omissions, Hughes effectuated a valid citizen's arrest under Texas law.

State law provides: "A peace officer *or any other person*, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace." Tex. Code Crim. Proc. art. 14.01(a) (emphasis added). And Texas's highest court for criminal matters has held this authorizes a citizen's arrest of a DWI suspect. *Miles v. Texas*, 241 S.W.3d 28, 39–44 (Tex. Crim. App. 2007).

Consider the facts of *Miles*. The citizen in that case was a tow-truck driver who chased a fleeing DWI suspect from a crash scene, at high rates of speed, over a median, and the wrong way down a one-way street into heavy oncoming traffic. *Id.* at 30–31. The Texas court understood the issue as "whether [the citizen] effectuated that arrest in a reasonable manner—a manner that a peace officer, standing in the citizen's shoes, could have legally done under the Fourth Amendment—and without significantly increasing the risk of danger and harm to the public welfare." *Id.* at 45. Because a police officer could have driven the way the citizen tow-truck driver did, that was sufficient to show that the citizen effectuated a reasonable and lawful arrest.

So too here. *Miles* allowed Hughes to arrest the drunk driver in "a manner that a peace officer, standing in the citizen's shoes, could have legally done under the Fourth Amendment." *Ibid.* Hughes retrieved the drunk driver's license and keys and then used handcuffs to further restrain him—all of which a police officer obviously could have done. So there can be no

doubt that, under the allegations in Hughes's complaint, his citizen's arrest was plainly lawful.

Other evidence confirmed the lawfulness of Hughes's actions and further eliminated any whiff of probable cause. His two 911 recordings revealed the urgency of the situation and the need for a citizen's arrest when the drunk driver repeatedly endangered himself and others. There was also the unmentioned 911 call from another concerned citizen, corroborating Hughes's story. And when the officers arrived, the driver was visibly intoxicated, failing the HGN test on six out of six factors. Thus, no one could reasonably conclude Hughes was impersonating a police officer simply because he detained another citizen.

Hughes's story confirmed what the evidence suggested. At every turn, Hughes repeated that he was a *former* police officer. He had been driving two passengers for Uber when he saw the GMC Sierra driving erratically. When the Sierra came to a stop after two collisions, he pulled up behind it. And finally, concerned for the drunk driver's safety and that of other drivers on the interstate, he used handcuffs—which he possessed because of his *previous* work as a police officer—to detain the drunk driver while he waited for help to arrive. According to Hughes's complaint, at no point did Hughes suggest to anyone that he was currently a police officer.

The only evidence suggesting Hughes ever impersonated a law enforcement officer—thus the only evidence that could possibly have established probable cause—came from the drunk driver's statement. As discussed above, the drunk driver reportedly told Officers Few and Garcia that Hughes had claimed to be a police officer. But even the officers' counsel admitted that this assertion came in the midst of the drunk driver's "crazy statement[s]." Oral Arg. at 8:01–17. Given the vast inconsistencies (indeed, impossibilities) reflected in both versions of the drunk driver's statement, the

No. 22-20621

driver's obvious intoxication, and the evidence supporting Hughes's account, no reasonable officer could have suspected Hughes committed a felony.[2] Therefore, a corrected warrant affidavit could not have established probable cause to arrest and prosecute Hughes.

\*　　\*　　\*

It is unclear which part of this case is more amazing: (1) That officers refused to charge a severely intoxicated driver and instead brought felony charges against the Good Samaritan who intervened to protect Houstonians; or (2) that the City of Houston continues to defend its officers' conduct. Either way, the officers' qualified immunity is denied, and the district court's decision is

AFFIRMED.

---

[2] The district court correctly noted *Laviage v. Fite* is distinguishable. ROA.747. In *Laviage*, this court reversed the denial of qualified immunity because it found the alleged omission immaterial to the finding of probable cause. *Laviage*, 47 F.4th at 407. Here, the slew of misstatements and omissions were obviously material because the only evidence supporting probable cause came from the drunk driver's statement, which the misstatements and omissions bolstered.